Brittany Rogers (SBN 274432)
brogers@omm.com
Nancy Lynn Schroeder (SBN 280207)
nschroeder@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
P: (213) 430-6000 | F: (213) 430-6407

[Additional Counsel listed in Signature Page]

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES TYSON, LENKA JOHN, and NOEL HARNER, individuals; SOCAL TRASH ARMY, an unincorporated association;<br><br>          Plaintiffs<br>vs.<br><br>CITY OF SAN BERNARDINO, a municipal entity; DOES 1-20,<br><br>          Defendant(s). | Case No.  5:23-cv-01539 TJH (KKx)<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>**Judge:** Honorable Terry J. Hatter, Jr.<br>**Date:**   September 18, 2023<br>**Time:**  10:00 a.m.<br>**Ctrm:** 9C |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT ......................................................................................... 2

    A.    THE FACTUAL RECORD STRONGLY SUPPORTS INJUNCTIVE RELIEF ...................................................................................... 2

        1.    SUBSTANTIAL CORROBORATED EVIDENCE SHOWS CITY PRACTICE VIOLATES THE LAW AND ITS OWN POLICY ................. 3

        2.    THE CITY'S EVIDENCE LACKS FOUNDATION, IS INTERNALLY INCONSISTENT, AND FAILS TO CONTROVERT PLAINTIFFS' DECLARATIONS ..................... 6

        3.    FUNDAMENTAL FACTS ESTABLISHING THE MERITS OF PLAINTIFFS' CLAIMS ARE UNDISPUTED .......................... 8

    B.    THE CITY'S LEGAL DEFENSES ARE MERITLESS ........................................ 11

        1.    FOURTH AMENDMENT....................................................... 12

        2.    DUE PROCESS ..................................................................... 14

        3.    ADA / REHABILITATION ACT CLAIMS ................................. 16

    C.    THE CITY FAILS TO REBUT PLAINTIFFS' SHOWING OF IRREPARABLE HARM .................................................................. 20

    D.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF THE PRELIMINARY INJUNCTION PLAINTIFFS ACTUALLY SEEK .................................................................. 20

III.  CONCLUSION.................................................................................... 23

# **TABLE OF AUTHORITIES**

**Cases**

*Armstrong v. Wilson*,
  124 F.3d 1019 (9th Cir. 1997)................................................................20

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018)................................................................21

*Communities Actively Living Indep. & Free v. City of Los Angeles*,
  No. CV 09-0287 CBM (RZx), 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) ........17

*Crowder v. Kitagawa*,
  841 F.3d 1480 (9th Cir. 1996)................................................................16

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019)................................................................20

*Davis v. City & Cnty. of San Francisco*,
  890 F.2d 1438 (9th Cir. 1989)................................................................22

*Fuentes v. Shevin*,
  407 U.S. 67 (1972) ................................................................14

*Garcia v. City of Los Angeles*,
  481 F. Supp. 3d 1031 (C.D. Cal. 2020), *aff'd*, 11 F.4th 1113 (9th Cir. 2021).....12, 13

*Janosko v. City of Oakland*,
  No. 3:23-cv-00035-WHO, 2023 WL 3029256 (N.D. Cal. April 19, 2023).............13

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991)................................................................22

*Lavan v. City of Los Angeles*,
  693 F.3d 1022 (9th Cir. 2012)................................................12, 13, 14, 16

*Martin v. PGA Tour, Inc.*,
  204 F.3d 994 (9th Cir. 2000)................................................................16

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................14

*McCormack v. Hiedeman*,
  694 F.3d 1004 (9th Cir. 2012)................................................................2

*McGary v. City of Portland*,
  386 F.3d 1259 (9th Cir. 2004)................................................................16, 17

*Miralle v. City of Oakland*,
  No. 18-CV-06823-HSG, 2018 WL 6199929 (N.D. Cal. Nov. 28, 2018) ...............15

*Mitchell v. City of Los Angeles*,
  No. CV 16-01750 SJO (GJSx), 2016 WL 11519288 (C.D. Cal. Apr. 13, 2016).2, 14

*Montano v. Bonnie Brae Convalescent Hosp., Inc.*,
  79 F. Supp. 3d 1120 (C.D. Cal. 2015)......................................................................20

*Shipp v. Schaaf*,
  379 F. Supp. 3d 1033 (N.D. Cal. 2019) ..................................................................15

*Sullivan v. City of Berkeley*,
  383 F. Supp. 3d 976 (N.D. Cal. 2019)......................................................................13

*Thompson v. Davis*,
  295 F.3d 890 (9th Cir. 2002) ....................................................................................17

*Trump* v. *Int'l Refugee Assistance Project*,
  137 S.Ct. 2080 (2017) ..............................................................................................22

*Yeager v. City of Seattle*,
  No. 2:20-cv-01813-RAJ, 2020 WL 7398748 (W.D. Wash. Dec. 17, 2020)............13

**Statutes**

28 CFR § 35.130(b)(3)....................................................................................................16

42 § U.S.C. 12132...........................................................................................................16

**Regulations**

28 C.F.R. § 35.130(b)(7)(i)............................................................................................19

28 C.F.R. § 35.150(a)(3)................................................................................................19

# I.     INTRODUCTION

Plaintiffs do not challenge the City's Citywide Policy on Encampment Cleanups (Dkt. 46-02, "Policy") on paper—but rather the City's deliberate, brazen, and ongoing practice of violating that Policy. As San Bernardino's City Manager stated in May 2023, the City's "goal" has been to find ways to not be "encumbered" by this policy.[1] Twenty-two sworn declarations, including firsthand accounts of the City's actual practices, corroborate Plaintiffs' claims that the City no longer feels so encumbered.

The Policy's existence removes any dispute that the balance of equities and public interest favor issuance of the preliminary injunction. The City concedes that its Policy was needed to redress its deprivation of an unhoused person's constitutional and ADA-protected rights. There is no dispute that summary destruction of property including housing documents, identification, items used for protection from the elements, and family memorabilia irreparably harm Plaintiffs. And there is no dispute that following the Policy is possible.

The City's legal challenges to Plaintiffs' claims on the merits rely on a series of fallacies: that warrantless seizures are not per se unreasonable; that pre-deprivation notice (regardless of the content of the notice) permits the summary destruction of property; and that it is entitled to use methods of administration that impose greater burdens on people with disabilities if they are facially "neutral." Each of these contentions has been specifically rejected by the District Court and by the Ninth Circuit.

---

[1] Plaintiffs' First Supplemental Requests for Judicial Notice In Support Of Motion for Preliminary Injunction ("Supp. RJN") ¶2, filed concurrently herewith.

The City cannot hide its actual practices behind an official policy it is not following—not when the record is replete with evidence of its on-the-spot destruction of personal property and failures to provide reasonable accommodations. Plaintiffs' requested preliminary injunctive relief does not prevent the City from maintaining its parks, protecting public safety, or disposing of trash. Instead, it simply seeks to preserve the status quo by ordering the City to practice its own Policy and provide the protections required by law. This relief will prevent undisputed irreparable harm to Plaintiffs, uphold the public interest in protecting civil rights, and will cause no foreseeable harm to the City, as it claims to already adhere to its own Policy. The Court should grant Plaintiffs' motion for a preliminary injunction.

## II.    ARGUMENT

### A.    The Factual Record Strongly Supports Injunctive Relief

At the preliminary injunction stage, "the Court cannot be asked to act as the final trier of fact." *Mitchell v. City of Los Angeles*, No. CV 16-01750 SJO (GJSx), 2016 WL 11519288, at *4 (C.D. Cal. Apr. 13, 2016). Rather, "an affidavit and a complaint may be the basis for a preliminary injunction unless the facts are substantially controverted by counter-affidavits." *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012). Here, Plaintiffs have submitted twenty-two affidavits from Plaintiffs and non-party witnesses that corroborate the facts.[2] By contrast, the

---

[2] The City submitted a list of objections to certain statements in some of the declarations accompanying Plaintiffs' Motion. *See* Dkt. 46-63. These objections are baseless and ultimately irrelevant. "Although a motion for preliminary injunction must be supported by evidence that goes beyond the unverified allegations of the pleadings, a district court may rely on otherwise inadmissible evidence in deciding such a motion." *Mitchell*, 2016 WL 11519288 at *4 n.5. Further, all objections to Plaintiffs' declarations are meritless for reasons stated in Plaintiffs' Responses to those objections, filed concurrently herewith.

City's response is limited to affidavits from its own employees and officials, not from any neutral parties or even its contractors. The City staff declarations are self-contradictory and "at best inconclusive." *Mitchell*, 2016 WL 11519288 at *4. Notwithstanding the City's denials, the factual record supports the issuance of injunctive relief. *See Lavan v. City of Los Angeles*, 797 F. Supp.2d 1005, 1014-15 (C.D. Cal. 2011) (granting preliminary injunction based on homeless plaintiffs' declarations averring to specific experiences with city's practice of property destruction, notwithstanding city's presentation of written protocol and declarations claiming it never engaged in such a practice); *Mitchell*, 2016 WL 11519288 at *4 (same).

### 1. Substantial Corroborated Evidence Shows City Practice Violates the Law and its Own Policy

There is no dispute that the City entered into a pre-litigation settlement with an unhoused individual who alleged the City destroyed his life-saving medication.[3] Compl. ¶8; Opp. at 6. The settlement resulted in the Policy the City now points to in an effort to defeat Plaintiffs' motion. *See e.g.* Dkt. 46-8, Miller Decl. Ex. A. But, by mid-2023, the City was intent on violating its newly-adopted Policy. The City's public statements evinced its intent to unencumber its agents from the settlement agreement's terms. At a May 3, 2023 City Council meeting, the City Manager described the City's "goal" to "go after these encampments" and "find some ways" to not be "encumbered" by the "ACLU agreement." Supp. RJN ¶2. At that same meeting, a City Council member discussed the City's strategy of entering into "the ACLU agreement" in order to delay legal action, but confirmed that now the City was

---

[3] While the ACLU acted as counsel for its client in that matter, representatives from the City have personalized this agreement, frequently referring to the agreement as "the ACLU agreement." *See, e.g.,* Supp. RJN ¶¶2-4.

"about ready to let loose [the] Public Works Department and [the] Police Department to tackle this [encampment] issue, so the ACLU agreement may have served its purpose." Supp. RJN ¶¶3, 4.

Had the City followed its Policy, there would not be rampant violations of unhoused people's constitutional rights. Instead, after adopting the Policy, City practice returned to summary destruction of property. As extensively documented in the evidence Plaintiffs submitted, that practice destroyed unhoused people's personal property, including tents, IDs, clothing, and medicine. *See* Dkt. 26, Butts Decl. ¶10; Dkt. 14, Tyson Decl. ¶16; Dkt. 15, John Decl. ¶16; Dkt. 18, Crume Decl. ¶¶4-6; Dkt. 19, Simmons Decl. ¶5-8; Dkt. 20, Davis Decl. ¶¶7-9; Dkt. 32, Timmons Decl. ¶8; Dkt. 40, Isenberg Decl. ¶¶9-10; Dkt. 17, Malaby Decl. ¶7; Dkt. 21, Castanon Decl. ¶22; Dkt. 22, Campbell Decl. ¶3; Dkt. 23, H. Giacona Decl. ¶3-4; Dkt. 33, J.Giacona Decl. ¶¶4-8; Dkt. 24, Sinohui Decl. ¶4; Dkt. 25, Rodriguez Decl. ¶3; Dkt. 34, Otto Decl. ¶¶4-5. These declarations corroborate each other and are corroborated by those of other witnesses. *See, e.g.,* Dkt. 26, Butts Decl. ¶¶7-8 and Dkt. 14, Tyson Dec. ¶11 (witnessing destruction of Plaintiff Tyson's property); *see also* Dkt. 9, Simmons Decl. ¶¶5-7 and Dkt. 20, Davis Decl. ¶¶6-7 (corroborating destruction at the sweep on June 20, 2023 at Seccombe Lake Park), Dkt. 40, Isenberg Decl. ¶¶9-10 (describing people upset or crying after the City destroyed their property). Organizational Plaintiff's declaration details replacing more than 50 tents, tarps, clothing, shoes, and medical supplies after these items were destroyed by the City. *See* Dkt. 17, Malaby Decl. ¶7.

Similarly, City practice does not follow its purported Policy for reasonable accommodations. The evidence shows that during the removal of over one hundred unhoused people from parks, there was no regard for their disability needs, and the

City failed to respond to individual reasonable accommodation requests. Dkt. 15, John Decl. ¶¶9-10; Dkt. 14, Tyson Decl. ¶8; Dkt. 26, Butts Decl. ¶¶7-8; Dkt. 28, Bravo Decl. ¶13; Dkt. 40, Isenberg Decl. ¶¶27-28; Dkt. 27, Grant Decl. ¶¶13-14; Dkt. 16, Harner Decl. ¶¶22-23; Dkt. 29, Cook Decl. ¶¶17-19; Dkt. 31, Prieto Decl. ¶¶18-19. On May 22, 2023 alone, the City failed to respond to six reasonable accommodations requests, including those made by Tina Cook and DeShawn Grant. Dkt. 40, Isenberg Decl. ¶¶27-28. The City, through an employee named "Christian" (last name unknown), received and ignored disabled people's reasonable accommodation requests. Dkt. 26, Butts Decl. ¶¶7-8, Dkt. 28, Bravo Decl. ¶13 and Dkt. 15, John Decl. ¶¶9-10.[4] The City, through an employee named "David" (last name unknown), told disabled, unhoused people to relocate to a remote field at Nunez Park where there was no water and no accessible terrain for walkers or wheelchairs. Dkt. 28, Bravo Decl. ¶14, Dkt. 40, Isenberg Decl. ¶¶24-25, Dkt. 26, Butts Decl. ¶9, Dkt. 29, Cook Decl. ¶11, Dkt. 15, John[5] Decl. ¶13. Because of this disregard for reasonable accommodation requests, unhoused, disabled people were forced to relocate to remote, inaccessible areas. Dkt. 17, Malaby Decl. ¶¶8-10.

---

[4] These mutually corroborating declarations contradict Ex. AA to the declaration of Cassandra Searcy (Dkt. 46-41), which lacks foundation because Ms. Searcy never identifies a basis for personal knowledge of the facts contained in the exhibit. All of these individuals state in no uncertain terms that they did not receive their requested accommodations, nor did they receive any communication from the City regarding whether their requests were approved or denied. Multiple declarations reference interacting not with Ms. Searcy, but with a City employee named "Christian" who has not submitted a declaration in this action.

[5] Ms. John is no longer in the park as she now has access to housing. Noel Harner's location has changed since the filing of the Motion, but Mr. Harner remains homeless.

### 2.   The City's Evidence Lacks Foundation, Is Internally Inconsistent, and Fails to Controvert Plaintiffs' Declarations

Undisputed facts about the role of City contractor, Burrtec, and the sheer volume of the City's property removal operations make it apparent that the City's declarants lack foundation to support the City's sweeping claims about its practices, much less controvert the direct, first-hand accounts documented in Plaintiffs' declarations.

The City's contract with Burrtec (the authenticity of which is undisputed) demonstrates the City specifically pays the company for "remov[al] and dispos[al] of materials from homeless or transient encampments," including "bedding and personal effects." RJN ¶¶10-11, Dkt. 35-2 at 47-48; Dkt. 46-7, Miller Decl. ¶24, Dkt. 46-1, Lamas Decl. ¶23. And despite admitting in declarations that Burrtec employees are the ones actually throwing away items into trash trucks, there are no declarations from any of these individuals. *See e.g.* Dkt. 46-7, Miller Decl. ¶21. Instead, the City proffers declarations from high-level policymakers removed from day-to-day operations.[6] No evidence rebuts Plaintiffs' substantial evidence showing Burrtec employes are doing exactly what the City is paying them to do: throw away homeless people's "personal effects."

---

[6] These declarations focus on inflammatory and stereotyping portrayals of homelessness. *See e.g.* Dkt. 46-53, Gutfeld Decl. As the Court held in *Garcia*, such evidence should be disregarded because it is irrelevant. 481 F. Supp. 3d 1031, 1044-45 (C.D. Cal. 2020), *aff'd*, 11 F.4th 1113 (9th Cir. 2021) (disregarding "nearly two hundred pages . . . dedicated solely to authenticating pictures of homeless encampments with items stored in public areas," descriptions of "vandalism, theft, and illegal activities" and "complaints from residents," holding city failed to demonstrate relevance). *See also* Plaintiffs' Evidentiary Objections To Defendant City of San Bernardino's Declarations And Exhibits (filed concurrently herewith).

---

Public Works Supervisor David Miller states that he personally "will try to stand between" items identified as personal property and those identified as trash "to help avoid confusion" as Burrtec employees load items into trash trucks. Dkt. 46-7, Miller Decl. ¶22. Yet Mr. Miller also states that he participated in operations at "more than 2,000 homeless encampments in the City" in the past year alone. *Id.* ¶3. He also avers that in a single day, the City has "removed" over a hundred encampments across different locations. Dkt. 46-9, Miller Decl. Ex. B-1; Dkt. 46-10, Miller Decl. Ex. C-1 (stating the City "removed 40 camps" at Meadowbrook Park and "removed 70 camps" at Perris Hill Park on May 15, 2023). With this high volume and frequency of operations spread across the City, it is implausible that the City's declarants could personally and consistently "watch everything carefully" as they claim, or have personal knowledge sufficient to declare that personal property is "never" thrown away. *See* Dkt. 46-7, Miller Decl. ¶¶22, 24

While the City's declarants claim to follow the Policy, pursuant to which the City provides post-seizure notices, *see* Dkt. 46-8, Miller Decl., Ex. A-8, 10, 12, 14, they present no evidence showing the City has ever used its post-seizure notice form. In fact, declarants never describe issuing any post-seizure notices to retrieve destroyed property. Similarly, though the City's declarants claim to follow the Policy when storing unattended property, there is no evidence documenting the City's actual storage of unattended property. Moreover, the City's "Discarded Property Log," does not actually list what items have been destroyed, *see* Dkt. 46-12, Miller Decl. Ex. E at E-2-E4, so it is impossible to tell whether items thrown into the trash truck included tents and personal effects, or whether the items were truly "trash" as the City claims. In these respects also, the City's evidence fails to controvert Plaintiffs' declarations.

Concerning what occurred on May 15, 2023, it is difficult to discern the City's version of events from its declarations and brief, which are riddled with inconsistencies. The City claims "only *one* individual asked to use the City's free storage service" during the operations on May 15, 2023, Opp. at 10 (emphasis added), but later states there were "*two* people who placed some of their property in storage," *id*. at 22 (emphasis added). Both claims strain credulity given the sheer number of people relocated. The City states "[n]o assistance of any kind was requested at Meadowbrook" (Opp. at 22), despite the City's own evidence showing that at least six people requested reasonable accommodations, Dkt. 46-41, Searcy Decl. Ex. AA at AA-1. The City claims "Eve Bravo was the only disabled person who expressed difficulty in transferring to the motel site." Opp. at 11 n.2. But the City acknowledges receiving reasonable accommodation requests from at least *five* people requesting transportation assistance that day at Meadowbrook Park. Dkt. 28, Bravo Decl. ¶¶7-11; Dkt. 29, Cook Decl. ¶¶12-16; Dkt. 14, Tyson Decl. ¶¶3-7; Dkt. 15, John Decl. ¶¶6-8; Dkt. 16, Harner Decl. ¶¶8-10; Dkt. 46-40, Searcy Decl. ¶9; Dkt. 46-41, Searcy Decl. Ex. AA.

### 3.   Fundamental Facts Establishing the Merits of Plaintiffs' Claims Are Undisputed

The City does not dispute many facts in support of Plaintiffs' claims. The City does not dispute that the neutral enforcement of its program that demands unhoused people remove themselves and all their belongings imposes disproportionate burdens on people with disabilities, especially those with mobility impairments. Nor does it dispute or present evidence rebutting Plaintiffs' evidence showing that disabled people have experienced harm attempting to comply with its orders. *See, e.g.,* Dkt. 29, Cook Decl. ¶18 (chest pain and shortness of breath from physical labor carried

out to comply with city orders); Dkt. 27, Grant Decl. ¶14 (swelling and leaking blood from site of leg injury, difficulty walking, and extreme anxiety after a day of physical exertion to comply with City's orders).

The City does not deny that it told disabled people to relocate themselves and their belongings to a remote, out-of-sight field at Nunez Park, far from services or transit, where water access had been shut off, and which did not have flat terrain accessible for wheelchairs or walkers. *See e.g.* Dkt. 28, Bravo Decl. ¶¶14-21 (she followed City instructions to relocate to this field and had no access to water and could not move her walker). It does not deny that Plaintiffs Tyson and Harner had to relocate to wheelchair inaccessible areas when they were displaced. Dkt. 14, Tyson Decl. ¶¶8-15; Dkt. 16, Harner Decl. ¶¶18-20. Indeed, the City's own statements indicate the apparent goal of its forced relocation program is to push unhoused people into remote, out-of-sight locations—which are inherently inaccessible for disabled people.[7]

The City never describes nor produces evidence of any official process for receiving and responding to disability accommodation requests. Further, there is no dispute the City has the property storage, transportation, staff, and housing resources available to provide specific accommodations requested by Plaintiffs and other declarants. And there is no dispute that the services requested as disability

---

[7] At a recent public meeting, declarant Cassandra Searcy described the effects of the City's mass park displacements: "…[W]hat's going to happen is that so that individuals do not feel like they are harassed or they know that the city is cracking down on its enforcement, they're going to go to neighboring cities that do not have the infrastructure in place to have people move out of their parks or move out of public spaces. ***Or they will move into areas that are less visible. And that's where they go to the riverbeds and areas that you do not see.*** Usually, they tend to either move along or get out of visible sight." Supp. RJN ¶6 (emphasis added).

accommodations have occasionally been granted to other disabled, unhoused people, such that they would not entail a fundamental alteration or harm the public interest. Opp. at 6; Dkt. 46-1, Lamas Decl. ¶15 (storage on request); *id.* ¶22 (additional time); Dkt. 46-40, Searcy Decl. ¶¶8-9 (transportation); *id.* ¶3 (motel vouchers); Dkt. 46-7, Miller Decl. ¶22 (assistance).

The unrebutted evidence shows that most disabled individuals who the City commanded to relocate with all their belongings were not granted any requested accommodations, there was no process in place to receive or process their requests, and most applicants never received any response at all from the City. *See* Dkt. 14, Tyson Decl. ¶¶8, 14-15; Dkt. 15, John Decl. ¶¶10, 20; Dkt. 29, Cook Decl. ¶¶17-19; Dkt. 27, Grant Decl. ¶¶13-14; Dkt. 28, Bravo Decl. ¶13; Dkt. 26, Butts Decl. ¶¶8, 10-11. The City does not deny that wheelchair-users Tyson, John, and Harner did not receive assistance moving and transporting personal property, nor did declarant Peggy Prieto—despite all having asked for it. *See* Dkt. 14-1, Tyson Decl. Ex. 1; Dkt. 15-1, John Decl. Ex. 1.; Dkt. 16-1, Harner Decl. Ex. 1; Dkt. 31-1, Prieto Decl. Ex. 1. Nor does the City deny that Plaintiffs Tyson and John (and Declarants Prieto and Cook) did not receive access to the property storage they requested. Dkt. 14, Tyson Decl. ¶¶3-8; Dkt. 15, John Decl. ¶¶6-8, 10, 20; Dkt. 31, Prieto Decl. ¶¶7-11, 18-19; Dkt. 29, Cook Decl. ¶¶12-19. No evidence rebuts Plaintiffs' showing that at least six people requested medically appropriate transportation to an alternate location, and the unrebutted evidence shows that no one received it; similarly, at least four people requested storage assistance and did not receive it. Dkt. 28, Bravo Decl. ¶¶7-11, 13; Dkt. 29, Cook Decl. ¶¶12-19; Dkt. 27, Grant Decl. ¶¶8-11, 13-14; Dkt. 16, Harner Decl. ¶¶8-10, 22-23; Dkt. 14, Tyson Decl. ¶¶3-8; Dkt. 15, John Decl. ¶¶6-8, 10, 20; Dkt. 31, Prieto ¶¶7-11, 18-19.

### B.    The City's Legal Defenses Are Meritless

Each of the City's legal defenses rests on arguments rejected by precedent from this District and the Ninth Circuit finding that nearly identical actions by other city governments constituted constitutional and ADA violations. The City obscures and misstates "the issue presented here" as whether its Policy, on paper, is lawful. Opp. at 13 n.3. The City has no basis for distinguishing its ***practices***, which Plaintiffs have consistently asserted violate the City's ***written*** Policy, from the practices addressed in the binding authority cited here.

The Ninth Circuit has long understood that actions speak louder than words. While the government is accountable for rights violations that flow from its written statements, ordinances, or regulations, it is also accountable for its longstanding and widespread practices. Despite a written policy to the contrary, "plaintiff may demonstrate that the harm is part of a "pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights." *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (*citing LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)); *see also Price v. Sery*, 513 F.3d 962, 973-74 (9th Cir. 2008) ("the City's official policy concerning the use of deadly force, as written, did not violate the requirements of the Constitution[,]" but "a 'longstanding' practice or custom of the City might in fact have deprived Perez of his constitutional rights."); *Gray v. County of Riverside*, No. EDCV 13-00444-VAP (OPx), 2014 U.S. Dist. LEXIS 150884, *128 (C.D. Cal. 2014) (certifying a subclass based on allegations of actual unlawful practices despite the County's contention that its written policies were lawful); *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 793-94 (5th Cir. 2020) (holding that "the existence of written ... policies does not, as a matter of law, negate Plaintiffs' above-mentioned evidence that the allegedly inadequate ... practices were pervasive.").

### 1.   Fourth Amendment

The City's argument that its actions were "reasonable" under the Fourth Amendment (Opp. at 12-19) faces a fundamental problem—those actions are virtually indistinguishable from the actions that the Ninth Circuit found to be unconstitutional in *Lavan* and *Garcia*.

First, the City offers no applicable precedent for eschewing the established rule that warrantless seizures are *per se* unreasonable. *See* Opp. at 12-13. The court in *Garcia* rejected the same argument based on Supreme Court and Ninth Circuit precedent. *Garcia v. City of Los Angeles*, 481 F. Supp. 3d 1031, 1043 (C.D. Cal. 2020), *aff'd*, 11 F.4th 1113, 1119 (9th Cir. 2021). There is no claim that **any** of the established exceptions to the rule apply here. *Recchia v. City of Los Angeles Dep't of Animal Servs.*, 889 F.3d 553, 558 (9th Cir. 2018) ("Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement.").[8]

Second, the City's suggestion that *Lavan* and *Garcia* did not rule on the reasonableness of property destruction during noticed cleanups (Opp. at 13) is patently false. In both cases, the Ninth Circuit clearly held that seizures like those at issue here are unreasonable under the Fourth Amendment. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012) ("The district court properly balanced the invasion of Appellees' possessory interests in their personal belongings against the City's reasons for taking the property to conclude that Appellees demonstrated a strong likelihood of success on the merits of their claim that by collecting and

---

[8] The Ninth Circuit upheld this rule even in the context of live birds stored in public. *Id.*

destroying Appellees' property on the spot, the City acted unreasonably in violation of the Fourth Amendment."); *Garcia*, 11 F.4th at 1118-19 (affirming district court ruling that seizure and immediate destruction of property during noticed cleanups was unreasonable).

Third, the City blatantly mischaracterizes *Lavan* as concerning a ***policy*** of summary destruction. The *Lavan* plaintiffs asserted—as Plaintiffs assert here—that the defendant city maintained a ***practice*** of throwing away homeless persons' unabandoned property on the spot, which was inconsistent with the city's purported policy. Like here, the defendant disputed that it maintained this alleged practice. *See Lavan*, 797 F.Supp. 2d at 1013-14 (noting city denial and city workers claiming "medications, legal paperwork, glasses, or other forms of identification are never dumped"). Based on declarations of three plaintiffs and two other witnesses, the district court concluded that plaintiffs had "clearly shown a strong likelihood of success" on the merits of their Fourth Amendment claim based on the practice—not the Policy. *Id.* at 1014-1016.

The other non-binding district court cases the City cites are inapposite. In *Sullivan*, the court considered a facial challenge to the defendant city's policy, and there was no evidence of on-the-spot property destruction over people's protests as there is here. *Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 984-85 (N.D. Cal. 2019). In *Janosko*, there was no evidence of summary destruction at all, in fact the Court noted the City offered to store everything including RVs during nearly one year of outreach to a specific encampment. *Janosko v. City of Oakland*, No. 3:23-cv-00035-WHO, 2023 WL 3029256 at *3 (N.D. Cal. April 19, 2023). And in *Yeager*, as the City acknowledges, there was "hardly any evidence." *Yeager v. City of Seattle*, No. 2:20-cv-01813-RAJ, 2020 WL 7398748 at *4 (W.D. Wash. Dec. 17, 2020). Here,

in contrast, Plaintiffs have introduced sixteen mutually reinforcing declarations with firsthand accounts of summary destruction. *See* Section I.A.1, *supra*.

A straightforward application of *Lavan* to the nearly identical facts here shows that Plaintiffs have established a likelihood of success on their Fourth Amendment claim. *See Mitchell*, 2016 WL 11519288, at *4 (accepting disputed facts contained in plaintiffs' affidavits as true and applying *Lavan* to issue preliminary injunction).

### 2.   Due Process

Pre-seizure notice alone does not provide the process required for the government to destroy property that may be "everything [a homeless person] own[s]." *Lavan*, 797 F.Supp.2d at 1016. The City does not and cannot cite any precedent to the contrary, and its position is foreclosed by longstanding law that the Constitution also requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 1017 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 339-43 (1976). *See also Fuentes v. Shevin*, 407 U.S. 67, 84-87 (1972)).

The City presents no evidence of any pre-seizure or post-seizure hearing before summary destruction of property, nor evidence that anyone has ever had the opportunity to reclaim unattended property the City purportedly stores.[9] Instead, the evidence shows that the City destroys property immediately after seizing it. *See, e.g.,* Dkt. 15, John Decl. ¶18 (pleaded with crew to retrieve her folder of medical paperwork but was told it was too late because it was already in the trash truck); Dkt. 40, Isenberg Decl. ¶¶9-10; Dkt. 26, Butts Decl. ¶10; Dkt. 20, Davis Decl. ¶¶6-7; Dkt.

---

[9] Despite the City's claims to store all property that is not "trash," there is no evidence that the City has stored any unattended property at all.

19, Simmons Decl. ¶5; Dkt. 21, Castanon Decl. ¶¶12-15.[10] The City's own evidence shows that the "notice" it posts indicates property will be stored for retrieval and does not mention summary destruction. See Dkt. 46-2, Miller Decl. Ex. A-8. Because the "notice" does not provide notice of summary destruction, nor offer a meaningful way to recover property that is seized, it does not provide due process. *See Mitchell*, 2016 WL 11519288, at *5 (city's posted notices advising of cleanups and requiring removal of property from designated areas did not address significant risk that homeless individuals would be erroneously deprived of property in violation of due process rights); *see also Proctor v. D.C.*, No. 1:18-CV-00701 (TNM), 2018 WL 6181739, at *3-4 (D.D.C. Nov. 27, 2018) (upholding due process claim where posted notice inaccurately assured readers that property left at site would be stored and available to reclaim, thus failing to give notice that unattended belongings would be destroyed).

The City's cited precedent also does not support its arguments. For example, in both *Miralle* and *Shipp*, the courts denied the preliminary injunction because there was no evidence that the cities were violating their policies, but noted that evidence of violating the policies would be a basis for granting preliminary injunctive relief. *Miralle v. City of Oakland*, No. 18-CV-06823-HSG, 2018 WL 6199929, at *3 (N.D. Cal. Nov. 28, 2018) ("These practices, if carried out at HDV, would raise serious questions with respect to Plaintiffs' still-pending Fourteenth Amendment claims."); *Shipp v. Schaaf*, 379 F. Supp. 3d 1033, 1038 (N.D. Cal. 2019) ("If the record

---

[10] Citing an unpublished out-of-district case, the City contends that Plaintiffs must allege what a "meaningful chance" to be heard would be. Opp. at 20. It is evident from the Complaint and the law cited herein that a "meaningful chance" is a process that would have enabled people like Plaintiffs John and Tyson to contest their property's seizure and to reclaim it before being permanently, erroneously deprived of it. Complaint ¶¶ 69, 74, 77, 94, 109, 170.

contained evidence that the City had repeatedly violated its own policies regarding the destruction of unhoused persons' property, it would raise serious questions as to the merits of Plaintiffs' claim."). Here, Plaintiffs submitted abundant evidence that the City is flagrantly disregarding its Policy.

Plaintiffs have therefore established a likelihood of success on their due process claim. *Lavan*, 797 F.Supp. 2d at 1017-1019 (because plaintiffs' evidence showed that "in some cases," city "both seized and destroyed necessities without any meaningful pre or post-deprivation to be heard," they "established a strong likelihood of success on the merits of their Fourteenth Amendment claim," notwithstanding city's claim that it posted pre-seizure notice); *see also Lavan*, 693 F.3d at 1032-33 (agreeing with district court).

### 3.   ADA / Rehabilitation Act Claims
#### i.   Disability Discrimination

The ADA prohibits not only denying disabled persons the benefits of its programs and services, but also "subjecti[ng]" such persons "to discrimination" by "utiliz[ing] . . . methods of administration" that impose greater burdens on them. 42 § U.S.C. 12132; 28 CFR § 35.130(b)(3). *See also McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (holding that "We have repeatedly recognized that facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced") (citing *Martin v. PGA Tour, Inc.*, 204 F.3d 994, 999-1000 (9th Cir. 2000)); *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (facially neutral and universally enforced policy violated ADA because it burdened disabled persons "in a manner different and greater than it burden[ed] others"); *see also Communities Actively Living Indep. & Free v. City of Los Angeles*, No. CV 09-0287 CBM (RZx), 2011 WL 4595993, at *14 (C.D. Cal.

Feb. 10, 2011) ("Because individuals with disabilities require special needs, the City disproportionately burdens them through its facially neutral practice of administering its program in a manner that fails to address such needs").

The City argues that it should be allowed to enforce the same "neutral deadline on the disabled and non-disabled alike" even if this relocation deadline "ha[s] a greater impact on the disabled." Opp. at 24. That is precisely what the ADA and the Ninth Circuit's precedent rejects. There is no dispute that the City's "neutral" enforcement disproportionately burdens people with disabilities. *See* Section I.A.3, *supra*. Thus, this "method of administration" subjects people with mobility impairments to discrimination and violates the ADA.

The parties agree that the ADA prohibits the City from denying disabled persons the "benefit of complying" with its demands in a manner consistent with their disabilities. Opp. at 22 (citing *Thompson v. Davis*, 295 F.3d 890 (9th Cir. 2002)); *see also McGary*, 386 F.3d at 1269. The City asserts that Plaintiffs have not been denied the ability to comply with its relocation order. Yet the evidence shows a practice of disregard for disability-related needs that denies Plaintiffs the benefit of complying in a way that meets their disability needs and that does not cause them harm—whether that harm is having property destroyed, physical pain, or relocation to a remote, inaccessible location. *See* Dkt. 29, Cook Decl. ¶18; Dkt. 27, Grant Decl. ¶14; Dkt. 14, Tyson Decl. ¶¶8-15; Dkt. 16, Harner Decl. ¶¶18-20; Dkt. 28, Bravo Decl. ¶¶14-21; Dkt. 15, John Decl. ¶20; Dkt. 20, Davis Decl. ¶¶6-7; Dkt. 26, Butts Decl. ¶10.

Accordingly, Plaintiffs have established they are likely to prevail on the merits of their ADA discrimination claim. *See McGary*, 386 F.3d at 1269.

### ii.    Failure to Accommodate

The City cannot credibly argue that the disability accommodations Plaintiffs requested would fundamentally alter the City's programs or require it to create new services—***the City claims to already have programs and policies in place***. Opp. at 9 (storage of belongings); *id.* at 10-11 (placement in non-congregate setting, alternate location); *id.* at 11 (transportation).[11] The ADA does not merely require the City to maintain these accommodations in theory, however, but to make them "readily accessible" to people with disabilities who require them, to actually accommodate them. *See* 28 CFR § 35.150(a); *see also* 28 C.F.R. § 35.130(b)(7)(i). The evidence establishes that the City has not done so.

The City failed to provide requested accommodations to nearly all the disabled declarants who submitted reasonable accommodation requests. Plaintiffs Tyson and John (and Declarant Prieto) did not receive assistance to pack and transport property. Dkt. 14, Tyson Decl. ¶¶8, 14-15; Dkt. 15, John Decl. ¶¶10, 20; Dkt. 31, Prieto Decl. ¶¶7-11, 18-19. Plaintiffs Tyson and John (and Declarants Prieto and Cook) did not receive access to property storage. Dkt. 14, Tyson Decl. ¶¶8, 14-15; Dkt. 15, John Decl. ¶¶10, 20; Dkt. 31, Prieto ¶¶7-11, 18-19; Dkt. 29, Cook Decl. ¶¶12-19. Declarant Bravo was never actually provided with transportation and relocation assistance. Dkt. 46-40, Searcy Decl. ¶9. In fact, the City presents no evidence they actually provided transportation or relocation assistance to any of the people who made a reasonable accommodation request. Dkt. 28, Bravo Decl. ¶¶7-11, 13; Dkt. 29,

---

[11] The City claims without evidentiary support that that allowing disabled individuals to remain until they can make alternate arrangements would "transform [its] parks" and prevent the City from performing necessary maintenance and cleanups. Opp. at 25. At the same time, the City claims it already provides more time to move to anyone who requests it. Opp. at 10, 15 (citing Lamas, Miller, Salinas declarations).

Cook Decl. ¶¶12-19; Dkt. 27, Grant Decl. ¶¶8-11, 13-14; Dkt. 16, Harner Decl. ¶¶8-10, 22-23; Dkt. 14, Tyson Decl. ¶¶3-8; Dkt. 15, John Decl. ¶¶6-8, 10, 20. The City's failure to provide these reasonable accommodations violates the ADA. *See Cooley v. City of Los Angeles*, No. 2:18-cv-09053-CAS-PLA, 2019 WL 3766554, at *4-5 (C.D. Cal. Aug. 5, 2019).

In fact, the City never even communicated whether the declarants' requests were approved or denied. The City does not dispute that it failed to respond to multiple reasonable accommodation requests submitted to it on May 22, 2023, by individuals seeking accommodation or their legal counsel; there is no evidence the City ever considered or reached a determination on these requests. *See, e.g.,* Dkt. 29, Cook Decl. ¶¶17-19, Dkt. 27, Grant Decl. ¶¶13-14, Dt. 40, Isenberg Decl. ¶¶27-28. Oral or written communication is necessary to make accommodations accessible to the people requesting them. Opp. at 11 n.2; *see also* 28 C.F.R. 35.150(a)(3) (requiring written statement). Yet, the City also does not dispute Plaintiffs' evidence that City officials did not provide oral or written determinations. *See* Dkt. 15, John Decl. ¶¶9-10; Dkt. 14, Tyson Decl. ¶8; Dkt. 26, Butts Decl. ¶¶7-8; Dkt. 28, Bravo Decl. ¶13; Dkt. 40, Isenberg Decl. ¶¶27-28; Dkt. 27, Grant Decl. ¶¶13-14; Dkt. 16, Harner Decl. ¶¶22-23; Dkt. 29, Cook Decl. ¶¶17-19; Dkt. 31, Prieto Decl. ¶¶18-19.

Finally, the City misrepresents the scope of Plaintiffs' ADA claim as limited to Meadowbrook and Perris Hill parks. Plaintiffs claim is that the City lacks an effective policy, process, or official designee for reliably investigating, considering, and providing responses to reasonable accommodation requests related to its "cleanup" programs and activities—whether those take place in parks or in other locations throughout the City. The City's failure to maintain a functional ADA process leads to its systemic failure to effectively respond to reasonable accommodation requests and

to ensure disabled persons have access to accommodations, violating the ADA. *See* 28 C.F.R. § 35.130(b)(7)(i); *id.* § 35.150(a)(3); *cf. Armstrong v. Wilson*, 124 F.3d 1019, 1026 (9th Cir. 1997) (affirming district court order directing defendant to adopt ADA compliance plan that included disability grievance procedures); *Montano v. Bonnie Brae Convalescent Hosp., Inc.,* 79 F. Supp. 3d 1120, 1135 (C.D. Cal. 2015) (enjoining defendant to hire an ADA consultant to craft process for residents to request reasonable accommodations and for defendant to respond to them).

### C.   The City Fails to Rebut Plaintiffs' Showing of Irreparable Harm

A strong showing of irreparable harm is not required where constitutional injuries are at issue. *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). However, Plaintiffs have submitted substantial and specific evidence of harm, showing that the City engages in a widespread practice of summarily destroying the belongings of unsheltered individuals without any meaningful pre or post deprivation hearing; that its methods of administering "cleanups" disproportionately burden disabled people and deny them equal access to the benefit of complying with the City's relocation orders; and that the City systematically fails to provide responses or disability accommodations when presented with reasonable accommodation requests or people's visible needs. *See* Section II.A., *supra*.

### D.   The Balance of Equities and Public Interest Weigh in Favor of the Preliminary Injunction Plaintiffs Actually Seek

Courts in this District have repeatedly affirmed that violations of the constitutional and disability rights that Plaintiffs seek to enjoin vastly outweigh the City's administrative inconvenience. *See* Dkt. 13 at 19-20. Rather than seriously dispute that the same balancing should apply here, the City trivializes Plaintiffs' claims as merely concerning violations of "rights at homeless encampment cleanups at two parks on May 15, 2023." Opp. at 6. That woefully misses the point. Plaintiffs

have described a *longstanding, widespread, citywide, and ongoing* custom and practice, and their fear of irreparable harm should that practice not be enjoined.

Plaintiffs' requested relief—a temporary cessation of the City's removal of its unhoused residents and their property from parks and other publicly accessible locations until a lawful plan is put into practice—is not "outside the bounds of reason," as the City asserts. Opp. at 25. It does not prevent the City from maintaining its parks or disposing of trash. *See Lavan*, 797 F. Supp. 2d at 1019 ("The City will still be able to lawfully seize and detain property, as well as remove hazardous debris and other trash; issuance of the injunction would merely prevent it from *unlawfully* seizing and destroying personal property that is not abandoned without providing any meaningful notice and opportunity to be heard."); *Garcia*, 481 F. Supp. 3d at 1051 (rejecting as "absurd" City's contentions that injunction against warrantless seizures without notice and opportunity to be heard would prevent removal of bulky property, trash, and other abandoned or dumped items from public areas); *see also Le Van Hung v. Schaaf*, No. 19-CV-01436-CRB, 2019 WL 1779584, at *7 (N.D. Cal. Apr. 23, 2019) ("nothing about the preliminary injunction order Plaintiffs seek prevents the City from . . . abat[ing] hazardous conditions"). It is certainly not a "blanket prohibition" on "performing any operation that could potentially involve removal of the unhoused." *See* Opp. at 25. Indeed, it would require little more than the City following the Policy it already claims to have and establishing a functional process for reasonable accommodation requests as it is already bound by law to do.

Even if the Court were inclined to adopt a narrower scope of injunctive relief, Plaintiffs' motion should still be granted. District courts are empowered to "tailor the scope" of any injunctive relief "'to meet the exigencies of the particular case.'" *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (*quoting Trump v. Int'l Refugee*

*Assistance Project*, 137 S.Ct. 2080, 2087 (2017)). The Court "has considerable discretion in fashioning suitable relief and defining the terms of an injunction," so long as it is "tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

For example, the Court could order the City to follow its own Policy (Dkt. 46-2) and abide by the representations it has made to this Court. *See Davis v. City & Cnty. of San Francisco*, 890 F.2d 1438, 1442 (9th Cir. 1989) (affirming district court's preliminary injunction requiring supervisors "to carry out and ensure compliance with" city's policies). Alternatively, the Court can order relief like what was specifically ordered in homeless property seizure cases decided by courts in this District and affirmed by the Ninth Circuit, *see Mitchell*, 2016 WL 11519288 at *7, *Lavan*, 797 F. Supp.2d at 1020, as follows:

**Enjoin the City, its agents, and employees from:**

1. Summarily seizing property, as part of homeless encampment "cleanups" or removals, absent an objectively reasonable belief that the property is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband; and

2. Destroying homeless persons' personal property, absent an immediate threat to public health or safety, without maintaining the property in a secure location for a period of no less than 90 days after providing a post-seizure notice listing the address where seized property is being stored and the process for retrieval.

**Further, the Court can order specific relief pursuant to 28 C.F.R. § 35.130(b)(7)(i) and *id*. § 35.150(a)(3), enjoining the City from:**

3. Conducting homeless encampment removals without maintaining an accessible process for reasonable disability accommodation requests to be submitted

to the City, investigated, responded to, and granted when such requests do not require a fundamental alteration of the program.

The relief outlined above maintains the status quo by holding the City accountable for what it claims to already be doing, ensuring compliance with existing constitutional and statutory obligations, and protecting Plaintiffs from further harm during the pendency of this litigation.

## III.    CONCLUSION

Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: September 1, 2023

Respectfully submitted,
O'MELVENY & MYERS, LLP

*/s/ Brittany Rogers*

Brittany Rogers (SBN 274432)
brogers@omm.com
Nancy Lynn Schroeder (SBN 280207)
nschroeder@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
P: (213) 430-6000 | F: (213) 430-6407

Cameron Westin (SBN 290999)
cwestin@omm.com
Bo Moon (SBN 268481)
bmoon@omm.com
O'MELVENY AND MYERS, LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660
P: (949) 823-6900 | F: (949) 823-6994

Catherine Rogers (SBN 315607)
krogers@aclusocal.org
Adrienna Wong (SBN 282026)
awong@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

1313 West 8th St.
Los Angeles, California 90017
P: (213) 977-5232

Brooke Weitzman (SBN 301037)
bweitzman@eldrcenter.org
Allison Greenberg (SBN 347106)
agreenberg@eldrcenter.org
ELDER LAW AND DISABILITY RIGHTS
CENTER
1535 17th St #110
Santa Ana, CA 92705
P: (714) 617-5353

### CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs James Tyson, Lenka John, Noel Harner, and SoCal Trash Army, certifies that this brief contains 6,768 words, which complies with the word limit of L.R. 11-6.1.

Dated: September 1, 2023

Respectfully submitted,
O'MELVENY & MYERS, LLP

*/s/ Brittany Rogers*

Brittany Rogers (SBN 274432)
brogers@omm.com
Nancy Lynn Schroeder (SBN 280207)
nschroeder@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
P: (213) 430-6000 | F: (213) 430-6407

Cameron Westin (SBN 290999)
cwestin@omm.com
Bo Moon (SBN 268481)
bmoon@omm.com
O'MELVENY AND MYERS, LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660
P: (949) 823-6900 | F: (949) 823-6994

Catherine Rogers (SBN 315607)
krogers@aclusocal.org
Adrienna Wong (SBN 282026)
awong@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th St.
Los Angeles, California 90017
P: (213) 977-5232

Brooke Weitzman (SBN 301037)
bweitzman@eldrcenter.org
Allison Greenberg (SBN 347106)

1                  agreenberg@eldrcenter.org

2                  ELDER LAW AND DISABILITY RIGHTS CENTER

3                  1535 17th St #110

4                  Santa Ana, CA 92705

                    P: (714) 617-5353