Brittany Rogers (SBN 274432)
brogers@omm.com
Nancy Lynn Schroeder (SBN 280207)
nschroeder@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
P: (213) 430-6000 | F: (213) 430-6407

[Additional Counsel listed in Signature Page]

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| JAMES TYSON, LENKA JOHN, and NOEL HARNER, individuals; SOCAL TRASH ARMY, an unincorporated association;,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SAN BERNARDINO, a municipal entity; DOES 1-20,<br><br>Defendants. | Case No. 5:23-cv-01539 TJH (KKx)<br><br>**FIRST AMENDED CIVIL RIGHTS COMPLAINT**<br><br>AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132); SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 794); UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983); U.S. AND CALIFORNIA CONSTITUTIONS; CAL. GOV'T CODE §815.6; CAL. CIVIL CODE § 2080 ET SEQ.<br><br>**DEMAND FOR JURY TRIAL** |

1

## **INTRODUCTION**

2    1.    This complaint concerns the City of San Bernardino's (the "City")

3  systematic violation of its duties under the Americans with Disabilities Act (ADA).

4  The City demands that disabled, unhoused individuals comply with impossible

5  orders to hastily relocate themselves and all their belongings or else face

6  confrontation with City security forces and the confiscation and destruction of their

7  property.

8    2.    This complaint also concerns the City's inhumane and unconstitutional

9  practice of summarily destroying its most vulnerable residents' personal property—

10  including essential items like medications and mobility aids that individuals with

11  disabilities need to live.

12    3.    Plaintiffs Lenka John, James Tyson, and Noel Harner (collectively,

13  "Individual Plaintiffs") are three individuals with mobility-related disabilities that

14  make complying with the City's orders to move impracticable, unsafe, or otherwise

15  unduly burdensome. In light of these difficulties, each Plaintiff submitted a

16  Reasonable Accommodation request to the City, describing their disabilities and

17  needs for accommodation when faced with the City's orders. But in each case, the

18  City ignored the Plaintiffs' requests, in violation of the ADA.

19    4.    When a crew contracted by the City arrived to remove Ms. John, she

20  repeatedly objected that, due to her mobility impairment, she was physically unable

21  to carry away all her belongings on the timeline the City demanded. After ignoring

22  her requests for disability accommodation, the City-contracted crew threw Ms.

23  John's walker, blood-pressure monitoring cuff, heart monitor, first-aid kit, and

24  medical paperwork into a trash truck while she watched. Even after Ms. John saw

25  one of the City workers throw her medical paperwork into the truck and pleaded

26  with him to retrieve it, she was told it could not be recovered because it had already

27  gone into a trash compactor.

28    5.    Similarly, after Mr. Tyson made his best efforts to comply with a City

relocation order by moving himself and his belongings to the closest alternative location accessible in his wheelchair—a shadeless parking lot fully exposed to the elements—a City crew entered the lot and threw away his clothes, food, money, hygiene supplies, and other essential items, disregarding Mr. Tyson's friend's offer to help move his belongings to yet another location if the City would just give him a little more time.

6.      Mr. Harner worried that the City will similarly deprive him of his belongings. The City forced Mr. Harner to move out of the park where he was living with all his belongings, which was very difficult due to his disability. After being forced to relocate without assistance and with nowhere to go, Mr. Harner lived in a nearby wash—a strip of dirt and rocks by a busy road—along with personal items essential for his survival: his wheelchair, tent, bedding, and food. This location made it exceedingly difficult for Mr. Harner to move himself and his belongings. He could not move his wheelchair out of the steep, rocky terrain by himself without getting out of his wheelchair and crawling, pulling it behind him.

7.      Ms. John, Mr. Tyson, and Mr. Harner are not alone in their experiences. The City has harmed scores of other people by engaging in a widespread practice of summarily seizing and destroying its unhoused residents' personal property over a span of multiple years dating back at least as far as 2021. The City has stripped people of their tents, clothing, hygiene supplies, wallets, identification cards, significant personal memorabilia, and even prescription medication—often casting people into dangerous circumstances by doing so.

8.      The City has already acknowledged that the summary destruction of property is improper. In 2022, the City discarded an individual's life-saving medication, throwing it into a trash truck, ignoring his requests to retrieve it; a San Bernardino Police Department officer told the individual he should go look for it at the city dump. The resulting gap in access to his medicine put the individual's health in serious peril. In response to legal pressure surrounding this incident, the

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

City entered into a pre-litigation settlement agreement to cease its longtime practice of summarily destroying unhoused people's property and enact new policies. Yet, in brazen violation of this agreement and the new policies it agreed to enact, the City continues to unlawfully seize and summarily destroy unhoused people's essential personal property.

9. In recent months, the City issued orders to vacate to dozens of people living in at least four different city parks, including many people with disabilities: people with limited mobility who rely on wheelchairs and walkers, people with severe epilepsy, people experiencing the effects of multiple strokes, and people recently hospitalized and recovering from serious medical conditions. The City has done this as temperatures reached dangerously high levels, knowing the often exacerbated impact of heat on those with disabilities and limited access to hydration. With deliberate indifference to the burdens imposed on such individuals, the City has abruptly demanded they move themselves and their belongings elsewhere, without identifying any accessible place they can go to or providing them with necessary assistance.

10. Flouting its requirements under the ADA and state disability laws, the City utterly fails to affirmatively accommodate these disabled individuals. Further, the City has no process in place to accept Reasonable Accommodation requests, to respond effectively to those requests, or to engage in an interactive process with requesters. As of the filing of this complaint, at least fifteen unhoused individuals with disabilities formally requested Reasonable Accommodations from the City. These reasonable requests included help from the City to move their belongings, to find an alternative, accessible, and adequate place to move, and to access medically appropriate transportation to their new location. The City failed to adequately respond to any of these requests. Instead, in nearly every case, *the City failed to provide any response at all*.

11. Consequently, people in wheelchairs who are unable to carry all of

their belongings out of the park have had to watch the City seize and summarily destroy their belongings. People using walkers and wheelchairs have been forced to retreat to nearby areas that are unsafe, where they must crawl across steep, muddy, or otherwise inaccessible terrain. Some individuals with limited mobility have had to resort to dragging their wheelchairs and walkers behind them just to reach these new locations.

12. Due to the City's persistent and widespread practice of disregarding the rights of unhoused people—backtracking from its agreement to correct its policies with flagrant disregard for its legal obligations to people with disabilities—Plaintiffs now seek relief from this Court.

## JURISDICTION AND VENUE

13. This Court has jurisdiction based on 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132, and 42 U.S.C. § 1983, because Plaintiffs' claims are brought under the laws and Constitution of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as these claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy as Plaintiffs' federal claims.

14. Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because all the events and omissions giving rise to the claims occurred or will occur in the Central District, and all defendants are located in the Central District, in the Eastern Division, in San Bernardino County. C.D. Cal. L.R. 83-1.1.

## PARTIES

### A.   Plaintiffs

15. Plaintiff JAMES TYSON is a 67-year-old resident of the City of San Bernardino. Mr. Tyson has experienced two strokes. As a result, he has difficulty walking and problems with eyesight, balance, memory, and information processing. Because of his disabilities, which substantially limit his life activities, Mr. Tyson

relies on a wheelchair or a walker for mobility.

16.   Mr. Tyson is currently unhoused. He lost his housing after several family members with whom he lived passed away. Mr. Tyson meets the U.S. Department of Housing and Urban Development (HUD) definition of homelessness, as he "lacks a fixed, regular, and adequate nighttime residence."[1] *See* 24 CFR 91.5.

17.   Plaintiff LENKA JOHN is a 55-year-old resident of the City of San Bernardino. Ms. John has a disability that substantially limits her major life activities. In 2022, she was hospitalized for a septic infection that led to permanent damage to her limbs. Continued pain, swelling, and limited function in her left leg impair her mobility such that she cannot take more than a few steps without the assistance of a wheelchair or walker. Ms. John also has scoliosis. She has a service dog that assists with her medical needs.

18.   At all times relevant to the events alleged herein, Ms. John was unhoused. She met the HUD definition of homelessness, as she "lack[ed] a fixed, regular, and adequate nighttime residence." *See* 24 C.F.R. 91.5.

19.   Plaintiff NOEL HARNER is a resident of the City of San Bernardino. Mr. Harner has a disability that substantially limits his major life activities. Specifically, his mobility is impaired due to the amputation of part of his left leg, so he relies on a hand-powered wheelchair to move around.

20.   At all times relevant to the events alleged herein, Mr. Harner was unhoused. After the City demanded he leave the park where he had lived, Mr. Harner was forced to relocate to a nearby, rocky, wheelchair-inaccessible wash near the park where he was previously living. He met the HUD definition of homelessness, as he "lack[ed] a fixed, regular, and adequate nighttime residence." *See* 24 CFR 91.5.

---

[1] This complaint uses the terms "unhoused" and "homeless" interchangeably, and both refer to the HUD definition of homelessness pursuant to 24 CFR 91.5.

21. Plaintiff SOCAL TRASH ARMY ("STA") is a volunteer-run, grassroots, non-profit unincorporated association that focuses on social injustices, food insecurity, environmental preservation, and promoting the dignity and equal treatment of unhoused people of the Inland Empire. It was founded in July 2020, with the initial goal of cleaning up trash from the natural environment in the San Bernardino area. Since then, the organization has expanded its mission to include providing aid to unhoused community members and people living in poverty throughout the region. Many of the individuals in the organization's service population have disabilities.

22. STA has suffered and continues to suffer harm through the diversion of its resources and frustration of its purpose resulting from the City's violations of the Federal and California constitutions and statutes.

**B.   Defendants**

23. Defendant CITY OF SAN BERNARDINO ("the City") is a municipal entity organized under the laws of the State of California. The City is a legal entity with the capacity to sue and be sued. The San Bernardino Public Works Department ("Public Works") and the San Bernardino Police Department ("Police Department") are departments of the City. Burrtec Waste Industries, Inc. ("Burrtec") is a City contractor and agent of the City.

24. Public Works is responsible for administering and monitoring the actions and activities of Burrtec, which is the sole provider of solid waste management for the City and closely cooperates with Public Works to jointly carry out public functions like park closures and maintenance.

25. The City maintains a contract with Burrtec providing that Burrtec will "remove and dispose of materials from homeless or transient encampments, which shall include but not be limited to . . . bedding, and personal effects" within two business days of being directed to do so by the City. The contract further provides that the City will make the Police Department available to Burrtec to coordinate the

removal and disposal of unhoused persons' personal effects.

26.     Public Works, the Police Department, Burrtec, and other employees and agents of the City have collectively coordinated and cooperatively carried out programs and activities throughout the City, under color of state law, that have summarily seized and destroyed unhoused people's property and violated the rights of people with disabilities. They jointly maintain and coordinate ongoing policies, customs, and practices that continue to result in unlawful seizure and destruction of property and violations of disability rights laws.

27.     On information and belief, employees and agents of the City, including Public Works, the Police Department, and Burrtec, engaged in the acts complained of herein pursuant to the City's policies, practices, and customs. Each acted in concert with each other. The City's employees and agents personally participated in the unlawful conduct challenged herein and, to the extent that they did not personally participate, they authorized, acquiesced in, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs. The challenged acts caused the violation of Plaintiffs' rights.

28.     The identities and capacities of Defendants DOES 1 THROUGH 20 are presently unknown to Plaintiffs, and on this basis, Plaintiffs sue these Defendants by fictitious names. Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE Defendants when ascertained. Plaintiffs are informed, believe, and thereon allege that DOES 1 through 20 are, and were at all times relevant herein, employees and/or agents of the City and are responsible for the acts and omissions complained of herein. Defendants DOES 1 through 20 are sued in both their official and individual capacities.

## FACTUAL ALLEGATIONS

**A.    The City's Systematic Violations of Disability Rights Laws**

29.     The City maintains policies and practices that discriminate against

people with disabilities and make the lives of unhoused residents with disabilities more difficult and dangerous. City employees and agents have displaced people with disabilities; seized and destroyed their property, including disability aids and equipment; and left them in dangerous, inaccessible situations without assistance— all while failing to provide reasonable disability accommodations or even an adequate process for considering and responding to requests for such accommodations.

30.     In the City of San Bernardino, as in cities across the state and nation, many people with disabilities have been forced into homelessness because they cannot afford market-rate housing. According to the Housing Element of the City's General Plan, the City has a serious lack of affordable housing for people who are low-income or extremely low-income. This is especially true for indigent people with disabilities. Of the City's 1,777 units of specialized housing for people with disabilities, all these units are market-rate and, therefore, unaffordable to the many disabled, unhoused residents of San Bernardino living below the poverty line.

31.     Nationally, people with disabilities are more than twice as likely to live in poverty as people without disabilities. This is reflected in the demographics of the City's unsheltered population[2]: 19.3% have a physical disability; 15.8% have a life-threatening and chronic health condition; 7.5% have a developmental disability; and 22% have a mental health disability.[3]

32.     Despite having ample notice that a great many of its unhoused residents are people with disabilities, the City regularly carries out programs and

---

[2] The term "unsheltered" refers to individuals who are both unhoused *and* without a physical shelter. For purposes of its Point-in-Time (PIT) count, HUD considers individuals and families sleeping in a place not designed for or ordinarily used as a regular sleeping accommodation (e.g., abandoned buildings, train stations, or camping grounds) to be "unsheltered."

[3] San Bernardino County, 2023 Continuum of Care Homeless Count and Survey Final Report, at p. 73-74, https://www.sbcounty.gov/uploads/sbchp/content/SBC-2023-Homeless-Count-Report.pdf (last accessed July 31, 2023)

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

1  activities targeting them in a manner that imposes greater burdens on disabled

2  individuals and without providing disability accommodations.

3       33.    The City has a team trained and dedicated to removing encampments

4  where unhoused people live, consisting of Public Works, the San Bernardino Police

5  Department, and Burrtec. This team carries out programs to remove unsheltered

6  people and their property from different locations throughout the City in a

7  coordinated effort. As alleged above, Public Works staff, Police Department

8  officers, and Burrtec employees cooperate and work in concert to effectuate these

9  programs, which require unhoused people to move themselves and all their

10  belongings by a certain date and time, and include activities to dispose of any

11  belongings people cannot move.

12       34.    The manner in which the City carries out these programs and activities

13  discriminates against people with disabilities. The City does not modify its policies,

14  practices, or procedures for these programs to accommodate people with

15  disabilities. Nor does it have a process in place to receive, consider, and respond to

16  Reasonable Accommodation requests from disabled people subject to these

17  programs.

18       35.    According to a report by the Director of Public Works from a City

19  Council meeting on June 30, 2023, the City has coordinated and carried out

20  thousands of these programs since September 2022.

21       36.    The City has designated Perris Hill Park, Meadowbrook Park, and

22  Seccombe Lake Recreation Area as sites of "high frequency" areas for these

23  programs, according to the Director of Public Works. The City conducted 346 such

24  operations at Perris Hill Park, 176 programs at Meadowbrook Park, and 60

25  programs at Seccombe Lake Recreation Area from September 2022 through June

26  2023.

27       37.    Public Works also maintains the City's public parks, including

28  providing for landscaping, pest control, graffiti abatement, painting, fencing, and

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

structural maintenance. In addition to the programs and activities described above, Public Works also occasionally closes city parks entirely, at the direction of the City Manager and City Council. The City has discriminated against people with disabilities and failed to provide for Reasonable Accommodations in the execution of these park closures as well.

### i.   The City's 2023 Park Closures and Property Destruction Operations

38.    Prior to May of 2023, dozens of unhoused people—many of whom have disabilities—lived in Perris Hill Park, Meadowbrook Park, Seccombe Lake Park, and Wildwood Park. Many people had lived in these parks for months or even years.

39.    People with disabilities lived in these parks because they provided relative safety compared to other locations in the City and have accessible paths and terrain for their wheelchairs and walkers. The parks are also near and accessible to water, food distributions, social services, stores, and a variety of other essential resources. A City senior center provides senior services at Perris Hill Park. Outreach teams from the County and non-profit agencies also visit the parks to provide services.

40.    On or about May 10, 2023, the City's Public Works Department announced that both Perris Hill Park and Meadowbrook Park would be closed temporarily due to "maintenance, health/safety inspections, and tree work." The "temporary" closure would extend from May 15, 2023 through May 19, 2023 for Meadowbrook Park, and from May 15, 2023, to May 31 2023 for Perris Hill Park. The City maintenance activities listed included: mosquito testing and treatment; chemical application for weeds; tree removals; tree trimming; deep pressure washing; signage replacement; parking lot deep-cleaning and re-striping; bathroom deep-cleaning and sanitizing; minor painting; graffiti abatement; playground sanitizing and inspection; tree planting; gate repairs; trash can repair; and mural art.

41.     On May 12, 2023, Plaintiffs' attorneys wrote to the City to inform the City of a high likelihood of harm to the health and well-being of unhoused people—especially people with disabilities—related to the City's planned park closures, and they alerted the City to the need for disability accommodations.

42.     On May 15, 2023, Public Works and Burrtec employees acting as City agents arrived at Perris Hill Park and Meadowbrook Park to effectuate the park closures. Officers from the Police Department were present in the park for at least parts of the operation. Public Works informed unhoused residents they needed to vacate the area, and any items that were left behind would be thrown away.

43.     Many affected residents gathered along the edges of each park, with belongings piled on the sidewalk, because they had nowhere to go. People conveyed to the City's employees and agents that they did not know where to go, or how they would be able to carry their belongings across the busy street adjacent to Perris Hill Park.

44.     In enforcing these park closures, the City did not provide reasonable accommodations for people with disabilities. It did not provide assistance to people who were unable to move their belongings. It did not provide accessible alternative locations for people to go to. It did not provide transportation to alternative locations. It did not even provide the people living there a safe way to cross the busy street while carrying whatever belongings they could, knowing that anything left behind would be seized and destroyed.

45.     The City's orders to everyone living in the park to move themselves and all their belongings were impracticable for many people with disabilities. People with mobility limitations struggled to collect and carry all their belongings across busy streets. Some people with disabilities were forced to leave items behind because they could not carry them on their persons. The property they were unable to carry out of the park was seized and destroyed by the City. On information and belief, no one received a post-seizure notice or opportunity to contest the

destruction even if they were present.

46.     With nowhere else to go and no relocation assistance, people in walkers and wheelchairs were forced to move into remote and inaccessible washes or ravines next to the park, where they are unable to properly use their mobility aids. They did so without the belongings they relied upon for protection from the elements if they were unable to carry these items due to their disabilities.

47.     Though the park closures were first noticed as "temporary," the City never allowed unhoused residents to return to Perris Hill Park or Meadowbrook Park. The stated reason for the park closures was "park maintenance," but the City's leaders and agents have made comments revealing their true intent to force unhoused people out of these areas. For example, at a City Council meeting on May 17, 2023, Councilmember Damon Alexander stated, "We clean out the parks, we invest a lot of our taxpayer dollars, how do we stop them [referring to unhoused people] from re-engaging and camping there again? How do we do that?"

48.     The City subsequently contracted after-hours private security guards to patrol the parks and prevent unhoused people from returning to the area. First implemented on June 1, 2023, guards now patrol multiple city parks between 8:00 p.m. and 6:00 a.m. at a cost of at least $30,000 per month. The City gives the guards authority and direction to issue citations to anyone who violates park rules. On information and belief, this includes authorization to cite people for being in the parks after hours.

49.     Following the closures of Perris Hill Park and Meadowbrook Park, the City has continued to close parks where unhoused people are known to live and to demand that they move themselves and their belongings, according to the same policies, customs, and practices.

50.     On or about May 22, 2023, the City ordered unhoused people to remove themselves and their belongings from Wildwood Park, displacing dozens of unhoused residents, many of whom have disabilities. At that operation, a woman

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

with congestive heart failure was forced to labor unassisted in the sun, against the advice of her doctor to avoid heavy lifting and direct sunlight, in order to preserve her belongings from destruction by the City.

51. On or about June 20, 2023, the City ordered many dozens of unhoused people to permanently vacate a field adjacent to Seccombe Lake Recreation Area, displacing dozens of residents. A City-contracted crew indicated residents had a limited amount of time to permanently exit the field with any belongings they could physically carry, telling them to "hurry up." Everything residents could not physically move was destroyed by being thrown into a trash truck. People with disabilities and/or medical conditions were especially burdened because their disabilities made packing and moving their belongings more difficult. Disabled residents were unable to move all their belongings as quickly as demanded and, as a result, permanently lost their property when the City destroyed their things.

52. Certain unhoused people at Seccombe Park were provided with short-term hotel vouchers by a non-profit organization. However, dozens of other people were displaced without a hotel voucher and had nowhere to go. Most of these displaced people ended up staying on the sidewalk along 7th Street, immediately adjacent to the field where they had been living. In this new location, they had little protection from the elements because many had lost their tents and tarps to the City's seizure and destruction. Among the people the City left in this situation was a woman who had just been released from the hospital after having surgery for a serious medical condition.

53. The City plans future park closures of this kind in addition to its routine encampment removal program.

54. The City's park closures, and its related directives and property destruction operations, impose different and greater hardships on individuals who have disabilities. Compliance with the City's directives to quickly and completely relocate requires intense physical activity—packing and carrying belongings, and

physically moving—that is especially difficult and in some regards impossible for people with mobility impairments like Plaintiffs. This has resulted in people with disabilities losing property and experiencing pain, suffering, and health consequences that people without disabilities have not. Further, the City's park closure and maintenance activities impose greater burdens on people with disabilities by closing off accessible paths, resources, and spaces, driving people with mobility impairments into inaccessible and unsafe areas.

55. The City has made clear that it intends to continue these activities by the increasing frequency and escalating intensity of its park closures and the related enforcement and property destruction activities.

**ii.** **The City's Failure to Respond to Requests for Reasonable Disability Accommodations**

56. On May 15, 2023, the day of the closure of Perris Hill Park and Meadowbrook Park, at least nine people with disabilities—including Plaintiffs James Tyson, Lenka John, and Noel Harner—submitted Reasonable Accommodation requests to the City related to the City's park closures and orders to vacate. On information and belief, the City did not adequately respond to any of these requests. In most cases, the City did not respond at all.

57. On or about May 22, 2023, during the closure of Meadowbrook Park, at least six people with disabilities submitted similar Reasonable Accommodation requests to the City related to the City's park closure and orders to leave the park. On information and belief, the City did not adequately respond to any of these requests. In most cases, the City did not respond at all.

58. The accommodations that people with disabilities requested from the City included: assistance with packing and transporting personal property; medically appropriate transportation to an alternate location; relocation to a wheelchair-accessible location; permission to remain in place due to difficulty moving items; placement in a non-congregate setting such as a motel; relocation to

1  a location allowing one to remain with their service animal; and storage of personal

2  property.

3       59.    These requested disability accommodations are existing programs,

4  services, and activities provided by the City. The City could modify its policies,

5  practices, and procedures to properly consider Reasonable Accommodation

6  requests and provide these accommodations to people with disabilities without

7  experiencing any undue burden, or it could engage in the interactive process and

8  determine what alternative accommodations could feasibly be offered. For the most

9  part, however, the City did not provide the requested accommodations and declined

10  to engage in the interactive process at all.

11       60.    The City already has an existing program to provide storage for

12  unhoused people's property: its "Storage Connect" program. Yet, the City did not

13  offer or provide access to this service to several people, like Plaintiffs Tyson and

14  Harner, who requested property storage in their Reasonable Accommodation

15  requests.

16       61.    Similarly, the City has coordinated with service providers to secure

17  hotel vouchers for unhoused people, including a small number of the individuals

18  displaced during the May 2023 park closures. However, on information and belief,

19  these vouchers were not provided in response to individual Reasonable

20  Accommodation requests, and the hotels were not available or accessible for many

21  people with disabilities, including those who specifically requested this

22  accommodation. Further, after the one-week vouchers expired, the City did nothing

23  to ensure that people with disabilities who had been displaced had access to an

24  adequate alternative location.

25       62.    City employees engaged in limited outreach to advise certain people in

26  the parks to relocate to an "alternate location." However, the "alternate location"

27  the City identified, a field near Nunez Park, is not adequate or accessible for many

28  people with disabilities. This field is far from Meadowbrook Park and Perris Hill

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

1   Park, in a remote location removed from social services, stores, food, water, and

2   other essential resources. The City also closed the public restrooms in this area and

3   turned off all of the water to this area soon after it encouraged unhoused people to

4   relocate there. The field is covered in gravel and dirt, as well as thick, tall, dry

5   grass, making it inaccessible for people in wheelchairs and walkers. Further, on

6   October 17, 2023—several months after City employees told unhoused people to

7   relocate to Nunez Park—the City targeted the area for a large-scale encampment

8   removal operation wherein the City failed to provide disability accommodations

9   and destroyed multiple individuals' personal property, including tents, medicine

10  and medical supplies, clothing, and more.

11        63.    The City has existing programs, services, and activities that could

12  facilitate providing reasonable accommodations to unhoused people with

13  disabilities. It has a Department of Community & Economic Development that

14  coordinates housing and homelessness services, including through its Deputy

15  Director of Housing and Homelessness, Cassandra Searcy. The City also employs

16  newly-hired homeless outreach workers who have the ability to provide

17  transportation to shelter and other services. The City receives federal funds for

18  homelessness services programs, drawing on the Coronavirus State and Local

19  Fiscal Recovery Fund, as well as Community Development Block Grants,

20  Emergency Solutions Grants, and the HOME Investment Partnership program.

21  These federal funds go towards permanent and interim housing, case management,

22  outreach, and transportation of individuals to and from needed services. Further, the

23  City's Parks & Recreation Department coordinates and offers senior services,

24  including through a senior center located at Perris Hill Park.

25        64.    However, for most of the days when the City enforced its park

26  closures, none of the housing and homelessness departments arrived with services.

27  The only City employees on-site for the vast majority of the closures were Public

28  Works employees, who did not have access to the services requested as reasonable

accommodations and did not appear to have authority to grant requests to help move property.

65.     The City already hires workers and contractors to move and transport items for its property seizure and destruction operations. It would not require additional equipment or staffing for the workers on-site to provide disabled individuals with their requested assistance with packing and transporting personal property.

66.     On or about May 22, 2023, a community volunteer was present to advocate for the people living in Meadowbrook Park. In response to the community volunteer's pleas, Public Works employees loaded one person's belongings onto the back of a flatbed truck and dumped the belongings in an adjacent parking lot because the property owner—a person with disabilities who had submitted a Reasonable Accommodation request—was unable to carry the items out of the park himself. This demonstrates that providing such assistance with moving disabled people's property as an alternative to destroying this property is feasible and would not constitute a fundamental alteration of the program.

67.     While Public Works staff and Burrtec contractors executing the City's park closures spent considerable time and resources seizing and destroying people's property by throwing it into trash trucks, they generally did not provide people in the parks with assistance moving their belongings—despite the fact that many of these people had visible mobility impairments and/or submitted Reasonable Accommodation requests. On information and belief, the City and its agents knew, or should have known, of the needs of these individuals and they did not assist.

**B.     The City of San Bernardino's Unconstitutional Practice of Summarily Seizing and Destroying Unhoused Residents' Personal Belongings**

68.     The City of San Bernardino has a longstanding and widespread policy, practice, and custom of seizing and destroying the property of unhoused individuals.  The City carries out these seizures with neither a warrant nor the

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

1  property owner's consent.

2      69.    The City does not give property owners an opportunity to contest

3  either the initial seizure or the permanent deprivation of their property before

4  summarily destroying their items. Property owners receive no post-deprivation

5  notice and no opportunity to get their items back. As a result, individuals who

6  temporarily leave their belongings to go to work or an appointment come back to

7  discover that everything they own is gone, with no way to retrieve their belongings

8  or contest the destruction.

9      70.    In 2021, the City, through the Police Department and City-contracted

10  crews, carried out over 1,500 encampment removals operations. These operations

11  involved taking unhoused individuals' personal property and discarding it and/or

12  destroying it in compactor trucks, permanently depriving people of their

13  medications, bedding, tents, clothing, personal effects, identification cards,

14  important paperwork, and more.

15      71.    On many occasions in the first half of 2022, in 2021, and in preceding

16  years, the City destroyed nearly all the personal property of multiple unhoused

17  people. The City destroyed one man's prescription life-saving medication over his

18  objections, as well as nearly all of his other personal property. The City destroyed a

19  woman's backpack that contained an urn holding the ashes of a deceased loved one.

20  The City destroyed another man's wheelchair and nearly all his other belongings.

21  The City destroyed one woman's tent, while her pet kitten was inside, by throwing

22  the whole thing into a compactor truck. The Police Department often used the threat

23  of arrest or citation to separate people from their belongings before City-contracted

24  crews destroyed the property.

25      72.    The City has continued to seize and destroy unhoused people's

26  property to the present day. In 2023, City officials planned and carried out multiple

27  encampment removal operations across locations throughout the City, during which

28  its employees and agents threw away the belongings of numerous unhoused

1    residents, including Plaintiffs Lenka John and James Tyson.

2        73.    On or about February 8, 2023, the City destroyed the personal property

3    of multiple individuals living in Wildwood Park—including blankets, bedding, and

4    clothing—leaving some people with nothing more than the clothes they were

5    wearing to keep warm. That night, temperatures dipped into the 40s.

6        74.    On or about May 16, 2023, the City destroyed the personal property of

7    Plaintiff Lenka John, including her walker and medical supplies, in Meadowbrook

8    Park. That same day, the City also destroyed the belongings of another person

9    living in that park who was unable to comply with the City's orders to move

10   himself and all of his property due to his disability. He lost his social security card,

11   personal mementos, and other belongings. The City-contracted crew told him to

12   "write a complaint" if he was unhappy about it.

13       75.    In early June of 2023, the City destroyed nearly all of Plaintiff James

14   Tyson's personal property in the parking lot next to Meadowbrook Park. Around

15   the same time period, the City destroyed the personal property of a woman in Perris

16   Hill Park, including her food, blankets, and her dog's food.

17       76.    On or about June 20, 2023, the City destroyed the personal property of

18   multiple individuals living in and around Seccombe Lake Park. A City crew,

19   including Public Works, the Police Department, and Burrtec, ordered unhoused

20   residents who had been living in the location for months or even years to

21   permanently move themselves and their belongings from the area. Everything

22   residents could not physically move was destroyed by being thrown into a trash

23   truck. As a result, many people lost their property, including medications, tarps,

24   clothing, hygiene supplies, bicycles, blankets, items used to prepare and store food,

25   flashlights, food, bedding, irreplaceable sentimental items, and important

26   documents, like a birth certificate.

27       77.    One person who had briefly left her belongings in a field near

28   Seccombe Lake Park returned to find all her property gone, including her high

blood pressure medication. Other individuals who lived in the area told her that they tried to preserve or retrieve her belongings, but the City-contracted crew and police did not allow them to do so.

78.    By June 30, 2023, temperatures were in the mid-90s, leaving those who had not been able to replace their tents fully exposed to the elements. This is particularly dangerous for those taking medication that requires they minimize direct sunlight. In August 2023, with no end planned to the regular seizures, temperatures some days will be over 100° F.

79.    Public Works supervisors were present at all or most of the operations involving the property destruction described above. Public Works management, including but not limited to Ernesto Salinas and David Miller, supervised and approved the actions of Burrtec and the City employees on site at these operations. On information and belief, Public Works supervisors had final policymaking authority delegated by the City regarding these operations, and Public Works management observed, knew of, and specifically approved the seizure and destruction of property by Burrtec and City employees and agents at these operations.

80.    Summary seizure and destruction of personal property are part of the City's standard operating procedure for its operations to remove encampments, and to clear parks and public spaces, which are jointly and cooperatively carried out by Public Works, the Police Department, and Burrtec. Public Works directs the time, place, and manner of Burrtec's participation in these operations. On information and belief, the City has adopted an official protocol for closing parks and clearing public spaces that includes directing Burrtec workers to throw into trash trucks any property left behind after Public Works staff order people to leave. On information and belief, the City Manager and Director of Public Works are aware of and have approved this protocol.

81.    The City has been deliberately indifferent to the substantial risk that its

supervision, training, and procedural safeguards are inadequate to prevent its employees and contractors from seizing and destroying people's property in violation of their rights, as well as the obvious consequences of such illegal property seizures. This is demonstrated by the City's disregard for the actual notice it has received of both specific instances in which its employees and contractors violated individuals' rights by unlawfully seizing and destroying their property, and the injuries caused to such individuals by depriving them of essential items they need to live.

82.     For example, in July of 2022, Plaintiffs' counsel sent a letter to the City describing multiple instances of unlawful property seizures – including the destruction of people's vital prescription medications. On March 10, 2023, Plaintiffs' counsel sent another letter to the offices of the City Attorney, Public Works, the City Manager's office, and the City's Deputy Director of Housing and Homelessness, which described the unlawful seizure of multiple unhoused individuals' belongings in Wildwood Park – including people's tents, bedding, and clothing. On April 7, 2023, Plaintiffs' counsel sent another letter to the City Attorney and several City staff members from the City Manager's Office and Public Works, providing details of eight different incidents involving the unlawful seizure and destruction of unhoused people's property.

83.     In light of the multiple notices provided to the City by Plaintiffs' counsel demonstrating the existence of an ongoing and widespread practice of unlawfully destroying the property of unhoused people, the City knew or should have known that its supervision, training, and procedural safeguards are inadequate to prevent its employees and contractors from seizing and destroying people's property in violation of their constitutional rights.

84.     On information and belief, the City has failed to properly investigate repeated incidents of unconstitutional seizure and destruction of personal property, and it has not disciplined, reprimanded, or punished any Public Works, Police

Department, or Burrtec employees for participating in these constitutional violations. The City continues to award Burrtec municipal funds to participate in the City's encampment removals and its park and public space-clearing operations, even though Burrtec employees have on many occasions seized and destroyed unhoused persons' belongings in violation of their constitutional rights, including in the presence of City police officers and Public Works officials.

85.     The City has made clear by the increasing frequency of these property seizures that it intends to continue its pattern, custom, and practice of confiscating without a warrant the belongings of unhoused individuals from parks and public spaces throughout the City, and immediately destroying those belongings without providing property-owners adequate notice or opportunity to be heard.

86.     The U.S. Interagency Council on Homelessness advises municipalities to avoid operations that destroy unhoused people's belongings. In its "7 Principles for Addressing Encampments," it issued the following guidance to local leaders: "Communities should take special care to avoid destroying personal belongings when an encampment closes and provide storage for an adequate period to allow a person the opportunity to collect their belongings… When an encampment is closing, or a person chooses to go into a shelter or treatment program that cannot accommodate all of their belongings, providing secure, accessible storage options can ensure that they do not lose personal items, including clothing and identification."[4]

87.     Studies have found that municipal operations that destroy unhoused people's belongings can lead to worse health outcomes, particularly for individuals

---

[4] U.S. Interagency Council on Homelessness, 7 Principles for Addressing Encampments, https://www.usich.gov/resources/uploads/asset_library/Principles_for_Addressing_Encampments_1.pdf (last updated June 17, 2022)

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

with existing disabilities.[5] The loss of tents, clothes, and sleeping bags can make people who are already ill much sicker. Repeated encounters with municipal crews that throw away people's belongings can result in repetitive traumatic experiences, creating a high-stress environment that may encourage survival-based, crisis-driven decision making. The mental suffering caused by these experiences can also decrease hope for the future and motivation for self-care, further impairing one's capacity for managing physical and mental health conditions.

## C.    Plaintiff James Tyson's Allegations

88.    On or about May 11, 2023, Public Works posted a notice in Meadowbrook Park, where Mr. Tyson lived, of an impending "clean up" scheduled for May 15, 2023. The notice did not include any information about the planned closure of the park or the City's plans to order everyone to move themselves and all their belongings completely out of the park indefinitely.

89.    On May 15, 2023, Public Works staff members told Mr. Tyson that he had to remove himself and all his belongings from Meadowbrook Park, where he had resided for many months.  He was not offered any alternative or assistance.

90.    Meadowbrook Park offers flat, accessible sidewalk areas, which are accessible for wheelchairs and walkers. It also offers trees for shade and protection from the elements. It is also the site of regular social services and food distributions by homeless service providers and charities.

91.    Because Mr. Tyson was concerned that his disabilities would make it impracticable for him to comply with the City's orders, he submitted a Reasonable Accommodation request to the City on May 15, 2023. His requested accommodations were: additional time to relocate; assistance with packing and transporting personal property; medically appropriate transportation to an alternate location; relocation to a wheelchair-accessible location; placement in a non-

---

[5] Qi, D., Abri, K., Mukherjee, M.R. *et al.*, Health Impact of Street Sweeps from the Perspective of Healthcare Providers, *J GEN INTERN MED* **37**, 3707–3714 (2022).

congregate setting such as a motel; and storage for his personal property.

92.   A City employee spoke with Mr. Tyson about his request on the afternoon of the day he submitted it, and the employee told Mr. Tyson he would get back in touch soon. However, Mr. Tyson never heard back from that employee or anyone else at the City about his Reasonable Accommodation request.

93.   On May 15, 2023, in response to the City's orders to relocate, Mr. Tyson—with the help of friends—moved himself and his property into the parking lot adjacent to Meadowbrook Park because he could not move very far due to his disabilities, and because he did not know where else to go. The parking lot is a shadeless strip fully exposed to the sun and the elements.

94.   On a date in early June, a City-contracted crew seized and destroyed Mr. Tyson's property located in the parking lot with no notice and no opportunity to dispute the action before or after it occurred. A friend of Mr. Tyson offered to move Mr. Tyson's belongings if the City's crew would just give him a little bit more time. The City's crew refused his offer and continued to throw Mr. Tyson' property into a trash truck. As a result, Mr. Tyson lost nearly all his personal belongings, including clothes, food, money, hygiene supplies, and other essential items.

95.   After losing his property, Mr. Tyson no longer felt safe staying in the parking lot because he feared that the City would destroy his property again. Joining other former Meadowbrook Park residents, Mr. Tyson moved into a ravine adjacent to the park. The ravine is fully exposed to the sun and the elements. Getting in and out of the ravine requires traversing a steep incline.

96.   Due to Mr. Tyson's mobility impairments, getting into the ravine area requires pushing his wheelchair or walker down the slope, and then sliding down the hill before transferring back to his walker or wheelchair. The area is covered in rocks and dust, which make it impossible to navigate the area in a wheelchair or walker.

97.    Mr. Tyson has fallen multiple times while getting in and out of the ravine—exacerbating the pain in his hips and legs. He has also missed food distributions by service providers held in the park area because it takes too long to get out of the ravine. It is also difficult for Mr. Tyson to bring food and water down into the ravine because of his mobility issues. As a result, Mr. Tyson has often gone hungry or thirsty.

98.    To make things worse, on or about July 31, 2023, San Bernardino police officers threatened Mr. Tyson and other unhoused people in the ravine with arrest if they did not leave the ravine. One officer told the group that if they were not all packed up and ready to leave upon their return, their belongings would be thrown away and they would be cited for trespassing.

99.    Mr. Tyson's loss of property and loss of his sense of safety have made his life more difficult. He has been forced to sleep on the hard ground without his bedding, and he has been working to replace his property that was destroyed. Mr. Tyson has also suffered from pain and an exacerbation of his mobility impairments as a result of being forced into the ravine, which is inaccessible due to his disabilities.

100.    Mr. Tyson now lives in and around the ravine with a tent and several items of essential personal property and, therefore, he is still at risk of summary confiscation and destruction of his property by the City in the future. Because Mr. Tyson is homeless, he is at risk of future harm resulting from the City's continuing policies, customs, and practices, including the loss of his remaining property and the injuries to his person that he may suffer if he is ordered to move yet again while still being denied the Reasonable Accommodations he has sought.

**D.    Plaintiff Lenka John's Allegations**

101.    On or about May 11, 2023, Public Works posted a notice in the park where Ms. John lived, Meadowbrook Park, of an impending "clean up" scheduled for May 15, 2023. The notice did not include any information about the planned

closure of the park or the City's plans to order everyone to move themselves and all their belongings completely out of the park indefinitely.

102.   On May 15, 2023, Public Works staff members told Ms. John that she had to remove herself and her belongings that day from the park where she had resided for many months.

103.   Because her mobility impairments made it impracticable to comply with the City's orders, Ms. John submitted a request for a Reasonable Accommodation to the City on May 15, 2023. Her requested accommodations were: assistance with packing and transporting personal property; medically appropriate transportation to an alternate location; relocation to a wheelchair-accessible location; relocation to a location allowing her to remain with her service animal; and permission to remain in place.

104.   A City employee spoke with Ms. John about her request that afternoon and told her he would get back in touch with her soon. However, Ms. John never heard back from that City employee or any other City employee about her Reasonable Accommodation request.

105.   On or about May 16, 2023, Ms. John was woken up by a different City employee, who told her she needed to vacate the park early that morning. Ms. John showed a copy of her Reasonable Accommodation request to the City employee, who told her he would investigate it. However, Ms. John never heard back from this City employee about her Reasonable Accommodation request either.

106.   The same City employee told Ms. John that she should relocate herself and her belongings to a remote field next to Nunez Park, roughly 2.5 miles away. Ms. John was not familiar with this area and getting there would have required her to cross over the freeway. The field is far from services, stores, and other resources. The City employee did not offer Ms. John transportation to this location or any other services.

107.   Ms. John never heard back from anyone at the City about her

1    Reasonable Accommodation request.

2        108.   Under pressure to leave, Ms. John began to leave the park with all the

3    belongings she could carry in her wheelchair, while also holding onto her service

4    dog. Because of her mobility impairments, she was unable to take all her property

5    with her and had to leave many of her belongings behind.

6        109.   As she left the park, Ms. John observed a City crew throwing away the

7    property she had to leave behind in the park. Ms. John understood the crew to be

8    operating under the color of City authority. She saw the workers throw a folder into

9    the back of a trash truck that she knew contained her medical records related to her

10   application for disability benefits. Ms. John went back and pleaded with the crew to

11   retrieve the folder, but was told that nothing could be done as the documents had

12   already been thrown into the trash compactor. In addition to the medical records,

13   the crew also threw away Ms. John's walker, first aid kit with a blood pressure cuff

14   and heart monitor, suitcase, and other personal items.

15       110.   This experience caused Ms. John significant distress after being

16   displaced with nowhere to go, without the ability to travel very far, and losing her

17   important personal property.

18       111.   The loss of Ms. John's medical records delayed her application for

19   disability benefits; the loss of her walker, which allowed her to be mobile in certain

20   situations when she does not use her wheelchair, further limited her mobility; and

21   she was forced to replace the walker and other essential items that the City

22   destroyed.

23   **E.    Plaintiff Noel Harner's Allegations**

24       112.   On or about May 8, 2023, representatives from the City of San

25   Bernardino came to Perris Hill Park and informed Mr. Harner and other individuals

26   staying there that the park would be closed for fifteen days starting May 15, 2023.

27   On or about May 11, 2023, Mr. Harner saw signs posted on trees in the park by the

28   City of San Bernardino, which stated that the park would be closed starting May 15,

1   2023. The signs indicated that people would need to vacate the park on the morning
2   of May 15, 2023.

3       113.   On the morning of May 15, 2023, City of San Bernardino employees
4   arrived and informed Mr. Harner that he needed to vacate. Police also arrived at the
5   park, but they did not speak with Mr. Harner. The City employees did not provide
6   any assistance to Mr. Harner after instructing him to vacate the park. Mr. Harner
7   was not told where he could or should go. He did not receive any help packing or
8   transporting his belongings. Leaving the park with his belongings was difficult due
9   to his physical impairment. Due to his limited mobility and financial resources, he
10  did not have anywhere else to go.

11      114.   Because his disability made it impracticable to comply with the City's
12  orders, Mr. Harner submitted a Reasonable Accommodation request to the City on
13  the morning of May 15, 2023. He requested the following accommodations:
14  assistance with packing and transporting personal property; medically appropriate
15  transportation to another location; relocation to a wheelchair-accessible location;
16  placement in a non-congregate setting such as a motel; and storage for his personal
17  property.

18      115.   After Mr. Harner submitted the request, two City employees arrived at
19  the park and approached him. They told Mr. Harner he would be given a one-week
20  voucher to stay at a motel by a local non-profit. However, they did not offer Mr.
21  Harner any assistance moving himself or his property to the motel. Fortunately, Mr.
22  Harner was able to make it to the hotel with assistance from a friend. After one
23  week there, however, his voucher expired. With nowhere to go once more, Mr.
24  Harner returned to Perris Hill Park with the assistance of a friend.

25      116.   When he returned to the area, Mr. Harner discovered that Perris Hill
26  Park was still closed and would remain so indefinitely. As a result, he was unable to
27  return to where he had been living.

28      117.   The area where he had been living before the City ordered him to leave

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

the park had multiple flat pathways, which were accessible because they allowed him to move his wheelchair, and it was near water, stores, and a senior center where he accessed services. In contrast, the area where Mr. Harner relocated, with limited mobility and nowhere else to go, is a rocky "wash" near the park. He then resided on a strip of dirt and rocks next to a busy road near the park.

118.   Mr. Harner's new location presented significantly more challenges for his disability. He could not move his wheelchair by himself in his new location, as it does not roll in the rocky dirt. Getting in and out of his new location required traversing a steep curb with no ramp. Without assistance, Mr. Harner had to push himself in his wheelchair on the side of a busy street, get out of his wheelchair on the side of the busy road, crawl over a divide, pull his wheelchair behind him, and then transfer back into his wheelchair. Pushing his wheelchair in the rocky dirt is impracticable and he cannot move his wheelchair very far in this location without the assistance of his friends.

119.   To date, Mr. Harner has never heard back from the City about his Reasonable Accommodation request.

**F.    Plaintiff SoCal Trash Army's Allegations**

120.   Plaintiff SoCal Trash Army (STA) is a volunteer-run, grassroots, non-profit unincorporated association that focuses on social injustices, food insecurity, and promoting the dignity and equal treatment of unhoused people of the Inland Empire.

121.   STA was founded in July of 2020, with the initial goal of cleaning up trash from the natural environment in the San Bernardino area. During its first trash cleanups, the organization's volunteers encountered multiple unhoused people and talked with them about the challenges they faced. As a result of these and similar experiences working in the community, the organization expanded its mission to provide aid to unhoused community members and people living in poverty throughout the region.

122.   The organization hosted its first mutual aid event focused on providing food to unhoused and low-income community members on Thanksgiving of 2020. At that event, volunteers provided meals to hundreds of people. The organization then began conducting regular food distributions to unhoused and other low-income community members in January of 2021.

123.   During its regular food distributions, volunteers learned that unhoused people regularly have their property unlawfully seized and thrown away by the City. In response, STA has diverted resources towards helping people replace the items the City has destroyed. STA has replaced at least 50 tents, 50-70 tarps, and hundreds of clothing items and shoes after the City destroyed these items. STA has also replaced medical supplies and walkers destroyed by the City after disabled individuals were unable to move their property in compliance with City orders due to their disabilities. Additionally, STA has diverted volunteer time and resources towards assisting individuals with replacing their driver's licenses after the City seized and discarded such essential documents.

124.   The City's policies, customs, and practices have frustrated STA's mission, including its ability to find the people to whom they are trying to provide food aid. Because the City regularly orders unhoused individuals to move themselves and all their belongings out of established locations, STA must spend at least an additional 20 minutes to one hour per week searching for individuals they are assisting who have been displaced. This has taken up more volunteer time, results in more driving time and mileage, and causes STA to spend more money on gas and car maintenance.

125.   It is especially difficult for STA to find people with disabilities who the City has displaced, as many individuals with mobility impairments denied Reasonable Accommodations have had to seek refuge in areas like ravines or riverbeds near the parks where they previously lived. These areas are more difficult for STA to access and locate. Further, STA has diverted resources towards helping

individuals with disabilities move themselves and their belongings to new locations in order to comply with city directives and avoid destruction of their property, when the City has failed to provide Reasonable Accommodations needed by disabled persons to comply with the City's relocation directives.

126.   If STA was not forced to divert its volunteers' time and resources to replacing items destroyed by the City and providing assistance to people whose disability rights were violated by the City, it would be able to spend more time on its core mission and activities of organizing community cleanups, environmental preservation, and distributing food aid to low-income individuals and families.

127.   Because the City's unlawful practices are ongoing, STA is at risk of future harm resulting from the City's continuing policies, customs, and practices, including future diversion of the organization's resources and frustration of its purpose.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Discrimination Against Persons with Disabilities**

**Americans with Disabilities Act**

**42 U.S.C. § 12132; 42 U.S.C. § 12133**

**(All Plaintiffs Against Defendant City of San Bernardino)**

128.   Plaintiffs reallege and incorporate the allegations set forth in the paragraphs above as though fully set forth herein.

129.   Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The opportunity to comply with a public entity's directives in a manner consistent with one's disability is a covered "benefit" under the ADA. Administration of programs or activities in a way that unduly burdens disabled

persons by imposing a different and greater burden on them is "discrimination" under the ADA. The ADA's implementing regulations specifically prohibit providing aids, benefits, or services in such a way that disabled individuals are not afforded an "equal opportunity to obtain the same result . . . as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii).

130.   Individual Plaintiffs are each "qualified individual[s] with disabilit[ies]" as defined by the ADA. 42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

131.   Defendant City is a "public entity" as defined by the ADA. 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

132.   Defendant City has discriminated against Individual Plaintiffs by enforcing its relocation directives, conducting maintenance and closures of City parks, and carrying out property seizure and destruction activities in ways that impose different and greater hardships on Plaintiffs as a result of their disabilities.

133.   Defendant City has denied Individual Plaintiffs meaningful access to the benefit of compliance with its directives to relocate in a manner consistent with their disabilities.

134.   As a direct and proximate consequence of Defendant's acts and those of its agents and employees, all Plaintiffs have suffered and continue to suffer injury and loss.

135.   Defendant's actions and those of its employees, agents, and/or contractors were taken pursuant to the City's policies, patterns and/or customs of discriminating against people with disabilities by imposing different and greater hardships on them and denying them the benefit of compliance with their directives in a manner consistent with their disabilities. These policies, patterns and/or customs violate the ADA. All Plaintiffs are entitled to injunctive and declaratory relief prohibiting Defendants from engaging in these unconstitutional customs, policies, and practices in the future.

1

## SECOND CAUSE OF ACTION

2

**Failure to Provide Reasonable Accommodations**

3

**Americans with Disabilities Act**

4

**42 U.S.C. § 12132; 42 U.S.C. § 12133**

5

**(All Plaintiffs against Defendant City of San Bernardino)**

6

136.   Plaintiffs reallege and incorporate the allegations set forth in the

7

paragraphs above as though fully set forth herein.

8

137.   To avoid discriminating against individuals with disabilities, public

9

entities are required to provide Reasonable Accommodations and/or modifications

10

to policies or practices. A public entity that fails to provide a reasonable disability

11

accommodation or modification, particularly after one has been requested, commits

12

a stand-alone violation of Title II of the ADA. 28 C.F.R. § 35.130(b)(7).

13

138.   A public entity has a duty to consider all resources available for use in

14

the funding and operation of a service, program, or activity when determining

15

whether a requested accommodation can be offered. If a public entity determines

16

that a particular accommodation cannot be provided, it has a duty to provide a

17

written statement of the reasons for reaching that conclusion. 28 C.F.R. § 35.164.

18

139.   Defendant violated its duties and Individual Plaintiffs' rights under the

19

ADA by ignoring or otherwise failing to respond to each of Individual Plaintiffs'

20

Reasonable Accommodation requests.

21

140.   Defendant failed to investigate the viability of Individual Plaintiffs'

22

requested accommodations and did not engage in any interactive process with them.

23

141.   Defendant failed to respond to, investigate, or engage with Individual

24

Plaintiffs' Reasonable Accommodation requests pursuant to its systemic failure to

25

establish policies and processes for receiving, processing, and responding to such

26

requests, and pursuant to the City's policies, patterns, practices and/or customs of

27

disregarding Reasonable Accommodation requests from unhoused persons with

28

disabilities.

- 34 -

142.   Defendant further violated its duties and Individual Plaintiffs' rights under the Americans with Disabilities Act by failing to provide Reasonable Accommodations for Individual Plaintiffs' mobility impairments, even though Individual Plaintiffs specifically requested Reasonable Accommodations that exist.

143.   As a direct and proximate consequence of Defendant's failures to provide Reasonable Accommodations under the ADA, and those of its agents and employees, all Plaintiffs have suffered and continue to suffer injury and loss.

144.   Defendant still does not have adequate policies and processes for receiving, processing, and responding to Reasonable Accommodation requests, and it continues to engage in policies, patterns, practices, and/or customs of disregarding Reasonable Accommodation requests from unhoused persons with disabilities. All Plaintiffs are entitled to injunctive and declaratory relief prohibiting Defendants from violating the ADA by failing to provide Reasonable Accommodations in the future.

### THIRD CAUSE OF ACTION

**Intentional Discrimination / Deliberate Indifference**

**Americans with Disabilities Act**

**42 U.S.C. § 12132; 42 U.S.C. § 12133**

**(Individual Plaintiffs against Defendant City of San Bernardino)**

145.   Plaintiffs reallege and incorporate the allegations set forth in the paragraphs above as though fully set forth herein.

146.   Defendant City has committed intentional discrimination under Title II of the ADA by demonstrating deliberate indifference, because it had knowledge that harm to Individual Plaintiffs' rights under the ADA was substantially likely to occur, and it failed to act upon that likelihood.

147.   Individual Plaintiffs' needs for disability accommodations were obvious and known to Defendant City and they requested specific, reasonable, and necessary accommodations from the City. Individual Plaintiffs all have visible

1   mobility impairments, as they rely on wheelchairs. Individual Plaintiffs all
2   submitted Reasonable Accommodation requests in writing to the City, which the
3   City acknowledged receiving.

4   148.   Individual Plaintiffs' attorneys gave Defendant City specific notice in
5   advance of its park closures that there was a substantial likelihood of harm to the
6   rights of people with disabilities if the City did not plan to provide Reasonable
7   Accommodations to people with disabilities.

8   149.   Nevertheless, Defendant City failed to investigate, respond, to or fulfill
9   Individual Plaintiffs' Reasonable Accommodation requests, or to offer any
10   modification of its policies, practices, or customs for enforcement of relocation
11   directives, closures of city parks, or property seizure and disposal activities.

12   150.   As a direct and legal result of Defendant's actions and omissions,
13   Individual Plaintiffs have suffered injury and loss, including serious emotional
14   distress, and are entitled to compensatory damages.

15   ### FOURTH CAUSE OF ACTION

16   **Violation of § 504 of the Rehabilitation Act of 1973**

17   **29 U.S.C. § 794**

18   **(All Plaintiffs against Defendant City of San Bernardino)**

19   151.   Plaintiffs reallege and incorporate the allegations set forth in the
20   paragraphs above as though fully set forth herein.

21   152.   Section 504 of the Rehabilitation Act of 1973 provides that "no
22   otherwise qualified individual with a disability … shall, solely by reason of his or
23   her disability, be excluded from the participation in, be denied the benefits of, or be
24   subjected to discrimination under any program or activity receiving Federal
25   financial assistance." 29 U.S.C. § 794(a); 34 C.F.R. § 104.4.

26   153.   A public entity that receives federal funding violates Section 504
27   where it fails to provide Reasonable Accommodations to individuals who need
28   these accommodations to ensure meaningful access to the public entity's services.

154.   The rights and obligations established by the ADA mirror those under Section 504, and the two laws are applied co-extensively.

155.   Defendant City has at all relevant times herein been a recipient of federal funding to address homelessness, including funding from the Coronavirus State and Local Fiscal Recovery Fund, as well as Community Development Block Grants, Emergency Solutions Grants, and the HOME Investment Partnership program.  The City also receives and uses federal funds for the cleanup and renovation of its parks, including $265,130.36 from a Community Development Block Grant used for improvements in Meadowbrook Park. These improvements include "improvement of ADA access ways."

156.   As alleged above, Defendant City has violated Individual Plaintiffs' rights under the ADA and maintains policies, practices, and customs that continue to violate the ADA by discriminating against persons with disabilities; denying such persons the benefits of compliance with its directives in a manner consistent with their disabilities; and failing to investigate, respond to, and fulfill requests for Reasonable Accommodations. Based on the same facts, Defendant City violates and has violated Section 504 of the Rehabilitation Act.

## FIFTH CAUSE OF ACTION

**Violation of Right to Be Secure From Unreasonable Seizures**

**42 U.S.C. § 1983 - Fourth Amendment; Art. 1, § 13, California Constitution**

**(All Plaintiffs against all Defendants)**

157.   Plaintiffs reallege and incorporate the allegations set forth in the paragraphs above as though fully set forth herein.

158.   Individual Plaintiffs James Tyson, Lenka John, and Noel Harner have a vested possessory interest in their property pursuant to state, constitutional, and statutory law.

159.   Defendants violated Plaintiffs' constitutional rights to be free from unreasonable seizures by threatening the seizure and destruction of their property

without a warrant and without any legal justification for doing so.

160.   Defendants further violated Plaintiffs Tyson's and John's constitutional rights to be free from unreasonable seizures by actually seizing their property without a warrant and without any legal justification for doing so. Defendants further violated their rights to be free from unreasonable seizure when they summarily destroyed Plaintiffs Tyson's and John's property, without a warrant and without legal justification.

161.   Defendants' acts and those of their employees, agents, and/or contractors were taken under color of state law, pursuant to the City's policies, patterns, practices, and/or customs of seizing and destroying unhoused individuals' property without a valid warrant or legal justification.  These policies, patterns, and/or customs are unreasonable and violate the Fourth Amendment of the U.S. Constitution, as applied to the states by the Fourteenth Amendment of the U.S. Constitution; Article 1, Section 13 of the California Constitution, and 42 U.S.C. § 1983.

162.   Plaintiffs are informed and believe that Defendants' acts and those of their employees, agents, and/or contractors were done with the specific, unlawful intent to deprive Plaintiffs of their constitutional rights to be secure in their property.  Furthermore, Plaintiffs are informed and believe that Defendants' acts were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, Defendants were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully.

163.   Defendants knew or should have known that their policies and practices of summarily seizing and destroying unhoused residents' property were unlawful. There have been multiple lawsuits addressing similar policies and practices in this jurisdiction.[6]

---

[6] *See, e.g., Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D. Cal. 2011), *aff'd*, 693 F.3d 1022 (9th Cir. 2012)*; Mitchell v. City of Los Angeles,* No.

164.  The City has failed to implement adequate supervision, discipline, and training to prevent its employees, agents, and contractors from seizing and destroying unhoused persons' property in violation of their constitutional rights. The City has failed to train its employees and contractors to handle, in a legal and constitutional manner, the usual and recurring situations in which they encounter unhoused people and their property. The City has failed to implement procedural safeguards to prevent its employees and contractors from seizing and destroying property in violation of people's constitutional rights. The City has failed to supervise its employees and contractors as necessary to prevent them from seizing and destroying property in violation of people's constitutional rights.

165.  As a direct and proximate consequence of the acts and omissions of Defendants' employees, agents, and/or contractors, Plaintiffs have suffered and continue to suffer injury and loss. Plaintiffs are entitled to compensatory damages for their loss of property and other injuries to their persons that have resulted from the violation of their Fourth Amendment and analogous state constitutional rights.

166.  Defendants continue to engage in the property seizure customs, policies, and practices that have caused and will continue to cause harm to Plaintiffs. All Plaintiffs are entitled to injunctive and declaratory relief prohibiting Defendants from unreasonably seizing and destroying property in the future.

### SIXTH CAUSE OF ACTION

**Violation of Right to Due Process of Law**

**42 U.S.C. § 1983–Fifth and Fourteenth Amendments;**

**Art. 1, § 7, California Constitution**

**(All Plaintiffs against all Defendants)**

---

CV1601750SJOGJSX, 2016 WL 11519288 (C.D. Cal. Apr. 13, 2016); *Garcia v. City of Los Angeles*, 481 F. Supp. 3d 1031 (C.D. Cal. 2020), *aff'd*, 11 F.4th 1113 (9th Cir. 2021). *See also Schuler et al. v. County of Orange*, Case No. SA CV 17-0259-DOC (KESx) (Cal. Sup. Ct., February 24, 2017)

167.   Plaintiffs reallege and incorporate the allegations set forth in the paragraphs above as though fully set forth herein.

168.   Individual Plaintiffs have a vested, possessory interest in their property pursuant to state, constitutional, and statutory law. Defendants violated Plaintiffs' due process rights by threatening to deprive them of their property and security therein without due process of law.  Defendants further violated Plaintiffs' Tyson's and John's due process rights by actually depriving them of their property without due process of law.

169.   Defendants provided Plaintiffs with no notice or inadequate notice that their property was at risk of being seized and/or destroyed and did not act to preserve the property or provide any means of reclaiming it in a timely manner.

170.   Defendants provided Plaintiffs no opportunity to be heard before depriving them of their property. Defendants further violated their rights by providing them no opportunity to be heard before permanently depriving them of that property by discarding and/or destroying it.

171.   Defendants' actions and those of their employees, agents, and/or contractors were taken pursuant to the City's policies, patterns and/or customs of seizing and destroying the property of unhoused individuals without adequate notice, opportunity to be heard, or opportunity to reclaim said property. These policies, patterns, and/or customs are unconstitutional and violate the Fifth and Fourteenth Amendment's Due Process Clause and Article 1, Section 7 of the California Constitution, which provides that individuals cannot be "deprived of life, liberty, or property without due process of law."

172.   Plaintiffs are informed and believe that the acts of the Defendants, their employees, agents, and/or contractors, were intentional in failing to afford Plaintiffs due process surrounding the deprivation of their property, and that, at minimum, Defendants were deliberately indifferent to the likelihood that the property would be seized and destroyed without due process.

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT

173.   As a direct and proximate consequence of the Defendants' acts and those of their agents, and employees, Plaintiffs have suffered and continue to suffer injury and loss.  Plaintiffs John and Tyson are entitled to compensatory damages for their property and other injuries to their persons.

174.   Defendants continue to engage in the customs, policies, and practices of depriving individuals of their property without due process of law that have caused and will continue to cause harm to Plaintiffs. All Plaintiffs are entitled to injunctive and declaratory relief prohibiting Defendants from engaging in these unconstitutional customs, policies, and practices in the future.

## SEVENTH CAUSE OF ACTION

**Violation of California Civil Code Section 2080 *et seq.***

**Cal. Civil Code § 2080 *et seq*; Cal. Gov't Code § 815.6;**

**(Individual Plaintiffs James Tyson and Lenka John against All Defendants)**

175.   Plaintiffs reallege and incorporate the allegations set forth in the paragraphs above as though fully set forth herein.

176.   California Civil Code § 2080 *et seq*. imposes mandatory statutory duties on public entities and their employees and agents to maintain for a minimum of 90 days unattended property over which they have taken charge, and to maintain for 60 days property that they have obtained from a person for temporary safekeeping. The Civil Code also imposes mandatory duties to abide by specific procedures and processes related to the storage, documentation, and disposition of property.

177.   Defendants' policies, practices, and conduct challenged herein violate California Civil Code § 2080 *et seq*. Defendants' employees and agents took charge of Plaintiffs' property, which was not abandoned. Rather than complying with the mandatory duty under Civil Code § 2080 *et seq*. to maintain, document, and store the property for temporary safekeeping, Defendants and their employees and agents summarily destroyed the items. Defendants' employees and agents failed to use due

care or protect and preserve Plaintiffs' personal property as required by Civil Code § 2080 *et seq.* when Defendants summarily destroyed Plaintiffs' property in public locations; failed to provide a written receipt, instructions for retrieval of the property, or notice that the property would be destroyed; failed to make reasonable efforts to identify the property's owner; and failed to track or otherwise store the property so that it could be located and retrieved on request.

178.   California Government Code § 815.6 provides a private right of action for injuries caused by a public entity's failure to discharge a mandatory duty imposed by an enactment.

179.   The failure of Defendants and their employees and agents to comply with their mandatory duties set forth in Civil Code § 2080 *et seq.* proximately caused Plaintiffs injuries, including property loss, emotional distress, anxiety, and pain and suffering, and Defendants are liable to Plaintiffs for those injuries.

180.   Defendant's breaches of the obligations set forth in Civil Code § 2080 *et seq.* are ongoing, and Plaintiffs are entitled to injunctive relief to prevent further breach.  Pecuniary compensation will not afford adequate relief; it will be extremely difficult to ascertain the amount of compensation which would afford adequate relief; and injunctive relief is necessary to prevent a multiplicity of judicial proceedings.

**BASES FOR REQUESTED RELIEF**

181.   An actual controversy exists between Plaintiffs and Defendants as to each and every Cause of Action alleged herein. Plaintiffs claim that these Defendants' acts and policies, practices and/or customs are contrary to law and seek a declaration of their rights with regard to this controversy.

182.   As a direct and proximate consequence of Defendants' acts and breaches of their duties, and those of their agents and employees, Plaintiffs have suffered loss and damages, including injuries to their persons and the loss of their essential personal property needed for their well-being and personal dignity.

183.   Plaintiffs will continue to suffer ongoing and continuous injuries unless Defendants are restrained by this Court. Defendants' policies, practices, customs, and actions will result in irreparable injury to Plaintiffs. Plaintiffs have no other plain, adequate, or complete remedy at law to address the wrongs described herein.

184.   Injunctive relief to prevent the breach of Defendants' obligations is proper because remedies available at law are inadequate, the balance of hardships justifies a remedy in equity, and the public interest would not be disserved by a permanent injunction.

185.   Plaintiffs timely presented their state law claims for injury, damages, and loss to the City in compliance with the claim presentation requirements set forth in California Government Code § 910 *et seq.* Plaintiffs' counsel mailed Plaintiffs' claim letter to the San Bernardino City Clerk on August 8, 2023 and conveyed the same letter via email to the San Bernardino City Attorney on August 10, 2023.

**WHEREFORE**, Plaintiffs respectfully request relief as follows:

1.     For a preliminary injunction and a permanent injunction, enjoining and restraining Defendants from engaging in the policies, practices and conduct complained of herein. Specifically, Plaintiffs seek injunctive relief to stop the City's ongoing violations of disability laws and civil rights, by enjoining the City as follows:

a.     Cease discrimination against people with disabilities in the administration of City programs, activities and services by:

i.     Establishing and maintaining a meaningful process for Reasonable Accommodation requests to be submitted to the City, investigated, responded to, and granted, relating to any of the City's services, programs, or activities that involve park closures, encampment removal operations,

1  and related property seizure, disposal, and destruction
2  operations;
3   ii.   Providing the Reasonable Accommodations requested by
4  Plaintiffs;
5   iii.   Affirmatively accommodating disabled persons, by
6  modifying the City's programs, services, and activities
7  related to "encampment cleanups," park closures,
8  and seizure and destruction of homeless individuals'
9  personal effects, as necessary to prevent discrimination
10  against persons with disabilities, including by providing:
11    1.   additional time to relocate;
12    2.   assistance with packing and transporting personal
13  property;
14    3.   medically appropriate transportation to a safe and
15  accessible alternate location;
16    4.   relocation to a wheelchair-accessible location;
17    5.   permission to remain in place until an adequate,
18  accessible alternative location can be arranged;
19    6.   placement in a non-congregate setting such as a
20  motel;
21    7.   relocation to location which allows an individual to
22  remain with their Emotional Support Animal and/or
23  Service Animal;
24    8.   and accessible storage for personal property;
25   iv.   Conducting a "self-evaluation" pursuant to 28 CFR §
26  35.105 of current city services, policies, and practices
27  related to park closures and property clearing operations
28  at such closures and at encampment clearing operations

and evaluate any resulting undue burdens of these services, policies, and practices on unhoused people with disabilities, and to the extent modification of any such services, policies, and practices is required and will not constitute a fundamental alteration, making the necessary modifications;

    v.    Engaging in an interactive process with individuals requesting Reasonable Accommodations, and if the City decides not to grant a requested accommodation, meeting its "duties" under 28 CFR § 35.164, including by assigning a public entity head or designee who will investigate and consider all resources available to meet the requesters' needs and provide written responses to requesters when necessary;

    vi.    Providing adequate training to all City staff and agents who may interact with unhoused individuals with disabilities regarding how to avoid disability discrimination and ensure that all legal requirements are met under the ADA and other disability laws;

b.    Cease the unlawful seizure and destruction of all personal property of unhoused individuals, including unattended personal property. This relief shall include:

    i.    Ensuring compliance with constitutional protections and statutory obligations, including Civil Code § 2080 *et seq.*, on the part of all City-funded contractors and other city agents, and all city agencies;

    ii.    Adopting lawful storage and documentation policies and practices to ensure all items seized by the City and its

1            agents are properly tagged and stored for post-seizure

2            retrieval. This documentation must include records of

3            items that the City and its agents seize and destroy as

4            "trash" and with an individual's purported "consent";

5        iii.    Providing adequate notice prior to any property seizure,

6            disposal, or destruction planned at park closures and

7            encampment removal operations, including information

8            on how to utilize the City's property storage program;

9    c.    Suspend all operations involving the removal of unhoused

10            people and their property from particular locations until a lawful

11            plan is put in place to address the violations alleged above.

12    2.    For a declaratory judgment that Defendants' policies, practices and

13    conduct as alleged herein violate Plaintiffs' rights under the United States

14    Constitution, the California Constitution, and federal disability laws, declaring that:

15        a.    The City violates the Americans with Disabilities Act and

16            Section 504 of the Rehabilitation Act of 1973 by administering

17            programs and activities related to park closures and property

18            clearing and destruction in a discriminatory way that unduly

19            burdens disabled persons by imposing a different and greater

20            burden on them;

21        b.    The City's actions of closing public parks and requiring people

22            to quickly move themselves and all their property out of those

23            parks, without providing Reasonable Accommodations for

24            people with disabilities, violate the Americans with Disabilities

25            Act and Section 504 of the Rehabilitation Act of 1973;

26        c.    The City violates the Americans with Disabilities Act and

27            Section 504 of the Rehabilitation Act of 1973 by denying people

28            with disabilities the benefit of compliance with its directives to

move themselves and their property in a manner consistent with their disabilities;

    d.    Defendants' ongoing operations that seize and destroy unhoused peoples' personal property without a warrant and without any legal justification violate the right to be free from unreasonable seizures; and

    e.    Defendants' ongoing operations that summarily destroy unhoused people's personal property violate due process protections in that these operations provide inadequate notice of the risk of property being seized and/or destroyed; fail to preserve property; fail to provide an opportunity to be heard or an opportunity to contest seizures and destructions of property; and fail to provide any means of reclaiming property in a timely manner.

    f.    The City's failure to adequately respond, or to respond at all, to Plaintiffs' Reasonable Accommodations violates the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973;

3.    Damages according to proof for the loss of Plaintiffs Lenka John's and James Tyson's property; the violation of all Individual Plaintiffs' constitutional and statutory rights; and for pain and suffering resulting from Defendants' unlawful conduct and deliberate indifference, according to proof;

4.    For punitive damages pursuant to 42 U.S.C. §1983 and any other applicable laws or statutes, in an amount sufficient to deter and make an example of the Defendants;

5.    For prejudgment interest according to proof;

6.    For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. §§ 1983, 1988, and any other applicable provisions; and

7.     For such further relief which is just and proper.

Dated: November 8, 2023                    Respectfully submitted,
                                           O'MELVENY & MYERS, LLP


                                           /s/ Brittany Rogers
                                           _____

                                           Brittany Rogers (SBN 274432)
                                           brogers@omm.com
                                           Nancy Lynn Schroeder (SBN 280207)
                                           nschroeder@omm.com
                                           O'MELVENY & MYERS LLP
                                           400 South Hope Street, 18th Floor
                                           Los Angeles, CA 90071
                                           P: (213) 430-6000 | F: (213) 430-6407

                                           Cameron Westin (SBN 290999)
                                           cwestin@omm.com
                                           Bo Moon (SBN 268481)
                                           bmoon@omm.com
                                           O'MELVENY AND MYERS, LLP
                                           610 Newport Center Drive, 17th Floor
                                           Newport Beach, California 92660
                                           P: (949) 823-6900 | F: (949) 823-6994

                                           Catherine Rogers (SBN 315607)
                                           krogers@aclusocal.org
                                           Adrienna Wong (SBN 282026)
                                           awong@aclusocal.org
                                           ACLU FOUNDATION OF
                                           SOUTHERN CALIFORNIA
                                           1313 West 8th St.
                                           Los Angeles, California 90017
                                           P: (213) 977-5232 | F: 213-915-0219

                                           Brooke Weitzman (SBN 301037)
                                           bweitzman@eldrcenter.org
                                           Allison Greenberg (SBN 347106)
                                           agreenberg@eldrcenter.org
                                           ELDER LAW AND DISABILITY RIGHTS
                                           CENTER
                                           1535 17th St #110
                                           Santa Ana, CA 92705
                                           P: (714) 617-5353

CASE NO. 5:23-cv-01539 TJH (KKx)
FIRST AMENDED COMPLAINT